## CARE AND PROTECTION OF ELAINE & others.[1]

No. 01-P-905.

Middlesex. January 16, 2002. - March 20, 2002.

Present: LAURENCE, KAPLAN, & DREBEN, JJ.

*Minor,* Care and protection, Custody. *Parent and Child,* Care and protection of minor, Custody of minor. *Evidence,* Child custody proceeding.

While the judge's subsidiary findings in a care and protection proceeding were supported by the record and were not clearly erroneous, the findings, taken together, did not prove the father's parental unfitness by clear and convincing evidence. [271-275]

PETITION filed in the Somerville Division of the Juvenile Court Department on September 15, 1999.

The case was heard by *Robert A. Belmonte,* J.

*David A.F. Lewis* for the children.

*Maria Makredes,* Assistant Attorney General, for Department of Social Services.

*Thomas R. Stritter* for the father.

DREBEN, J. This is an appeal by a father and his three minor children from a judgment placing the children in the permanent custody of the Department of Social Services (department) on the ground that their parents are currently unfit and the children are in need of care and protection.[2] The children, whom we refer to as Elaine, Frank, and Maureen, also appeal from the denial by the judge of their motion for a new trial. Their appeals have been consolidated.

The father and children claim that the evidence and the judge's findings are insufficient to find him unfit. Although the judge's subsidiary findings are supported by the record and are

---

[1]Frank and Maureen. All the children's names are pseudonyms.
[2]There is no appeal by the mother before us.

not clearly erroneous, the findings, taken together, do not prove parental unfitness by clear and convincing evidence. *Custody of Eleanor*, 414 Mass. 795, 800 (1993). Accordingly, we reverse the judgment.

The findings arose in connection with a petition for care and protection brought by the department on September 15, 1999, seeking custody of Elaine (born on November 7, 1988), Frank (born on June 24, 1990), and Maureen (born on January 14, 1992). The accompanying affidavit of a social worker of the department claimed that the children, who had been living with the mother but not with the father, had been neglected by the mother as she had left them unsupervised at a shelter. The affidavit described various improper actions of the mother as well as her history of drug abuse, but did not mention the father other than to identify him and to request termination of the rights of both parents.

Represented by counsel, the parties on September 21, 1999, entered into a stipulation accepted by the court, in which they agreed that the department would retain temporary custody of the children, would develop a service plan for the parties, would facilitate visitation, and that a court investigator would be appointed. After a two-day trial in October, 2000, the judge issued findings, which we summarize as they relate to the father, supplemented on occasion (as will be indicated) by uncontested evidence that was introduced at trial, primarily by the department.

At the outset of his memorandum, before setting forth any facts, the judge declined to accede to the department's request to terminate the rights of the father stating:

> "Although the evidence will show that both the mother and the father are unfit to parent these children at this time, there is sufficient evidence to show that the father has the capacity to change and to make plans for parenting these children."[3]

---

[3]In his order denying the children's motion for a new trial, the same judge ordered the department "to immediately pursue permanency planning for the children either with father or other relatives." He also "further ordered that such planning shall not include any plans for adoption of these children."

The judge next proceeded to describe each of the parents and the children. Although her appeal is not before us, we mention some of the findings relating to the mother in order not to omit any unfavorable facts concerning the father. The department first became involved with the family in August, 1989, a time when the mother was using drugs. In summarizing and quoting from a number of "screening narratives" relating to G. L. c. 119, § 51A, reports, almost all of which dealt with substance abuse and neglect by the mother, the judge listed one screening narrative dated May, 1995, which raised a question of domestic violence on the part of the father. The department investigation did not support that allegation, and the judge did not elaborate or make reference to this matter again.[4],[5]

Although not specifically mentioned by the judge, the adoption plans prepared by the department indicate that the department had temporary custody of the children on two occasions, from June 1, 1994, to September 6, 1994, and from August 15, 1995, to October 24, 1997. On both occasions the children were returned to their parents.

After the children were returned in 1997, until June, 1999, the children and their mother lived with the mother's sister in Cambridge. In June, 1999, when they were forced to move because the mother's sister rented a smaller apartment, the mother and the children moved to a shelter in Somerville. A § 51A report filed on June 16, 1999 alleging drug use by the mother led to the filing of the present petition in September, 1999.

After setting forth the foregoing narrative and finding neglect by the mother, the judge turned to a discussion of the father. The father was arrested once in 1988 and twice in 1989 for possession with intent to distribute drugs. He served ninety days in the house of correction and received a suspended sentence and probation to January 24, 1992, at which time probation on all cases was terminated. He was charged with crimes unrelated to drugs in 1993 and 1994, but there was no indication that there were any subsequent arrests.

---

[4]The investigator appointed by the court stated: "No evidence of abuse or neglect of the children by [the father] was discovered by this investigator for the relevant time period of this petition: February 1998 to present."

[5]The issue of the admission of these reports is not raised on appeal.

The judge made additional subsidiary findings. After the children were returned to their parents' custody in 1997, the family had trouble finding housing. While the mother and the children lived with her sister in the sister's apartment in Cambridge, the father also lived in Cambridge with a daughter of his previous marriage. When the mother moved to the shelter, the father had minimal contact with the children, although he saw them occasionally in the community.

After the department received custody in September, 1999, the father visited monthly with the children at the department's office. On a visit in June, 2000, he brought a birthday cake for his son Frank. He also brought a few gifts, including a wiffle ball with which he played with his son. After the festivities, the father "mostly sat in a chair during the visit while the children pretty much played on their own."

The father lives in one room, sharing an apartment with F.H. and her nineteen year old son. If the children are returned, "he plans to move in with [K.M.] until he can find a suitable apartment."

The father, who was born on February 24, 1931, was sixty-nine at the time of trial and undergoes dialysis two times a week for two to three hour sessions. "[He] assert[ed] that his kidney problem would not affect his ability to care for his children."[6] He said that he would be able to work to support the children and that there would be family members who would step in to care for the children if he is held up because of his work.

The judge next discussed the children, indicating that then twelve year old Elaine was described by the guardian ad litem as very attractive, very articulate and proud of her schoolwork. She saw her father every month and enjoyed those visits. She said her mother was the one that spoiled them, while her father was more strict and set clearer limits for them. Frank was described as a very cute boy, very engaging and very playful.

---

[6]The department acknowledged that the father, in response to the department's request in its service plan for the period March 22, 2000, to September 22, 2000, provided a letter from his physician indicating that he could take care of the children, and a letter from his dialysis provider stating that his dialysis schedule would not interfere with his parental duties.

He told the guardian ad litem that he wanted to return to live with his parents. He thought that his mother was out of the home working a lot and that his father did most of the caretaking around the house. Maureen was described as appearing younger than her five and a half years and told the guardian ad litem that she loved her foster mother and called her "mommy."

The judge determined that the mother had neglected her children at the shelter and that she has a serious drug problem which impairs her ability to parent her children.[7] "In contrast to [the mother's] behavior in her parenting role," the judge concluded, "[the father] has overcome his problems with the law and with drugs. . . . [He] has been more consistent in visiting his children.[8] . . . Although there has been criticism of him for his failure to be more active with the children during the visits, I conclude that the children have enjoyed the visits and that he has enjoyed being with his children. . . . [He] loves his children and has tried his best to parent them."[9] The judge then concluded:

> "18. I am aware, however, of the difficulties young parents have raising their children. It is all the more difficult for [father] to care for these three children given his age and his health.
>
> "19. I conclude that it will take a great deal of effort and assistance for [father] to parent these three children.
>
> "20. [The f]ather says he can stay with [K.M.] with the children if he gets them back. Yet he has not presented

---

[7]The judge noted that "[b]ut for the technical problems [the department had failed to check the box seeking termination on the face of the petition for care and protection], the evidence presented would support the termination of parental rights against the mother." He also raised the question whether the rights of only one parent could be terminated, a question answered in the affirmative subsequent to his decision. See *Adoption of Willow*, 433 Mass. 636, 644 (2001).

[8]The department worker who filed the affidavit accompanying the care and protection petition acknowledged that the father always appeared for the monthly visits and was always "appropriate" at the visits, and that the children hug and kiss him.

[9]Both Elaine and Frank told the guardian ad litem that the father did most of the caretaking, including cooking.

any evidence of who this person is or whether she would allow him to use her home as an interim residence while finding suitable habitation for him and his children."

The judge further stated that he is "impressed with the effort the [d]epartment . . . has put into this very difficult case," pointing out that in its adoption plans, the department was sensitive to the father and had stressed the need to find an adoptive family that would allow the children to maintain contact with their birth family.

After setting forth correctly the applicable principles of law, the judge determined:

> "Based upon all the evidence, the arguments of counsel, the applicable law, the facts found, and the conclusions I have drawn from them, I find [m]other and father to be unfit at this time to parent these children. I determine the children to be in danger of abuse or neglect. I therefore grant custody of the children, [Elaine, Frank, and Maureen] to the Department of Social Services until they have reached their eighteenth birthdays or until the purpose of this commitment has been satisfied whichever should first occur."

The judge recognized the father's love for his children and that, with help and proper planning, he might be successful in parenting the children, an outcome the judge clearly thought desirable. The judge's concern and caution for the interim period, however, in view of his subsidiary findings, do not warrant the ultimate finding of unfitness. The only current criticism of the father in the entire memorandum is that the father did not present any evidence as to K.M. or show that she would allow him to use her home as an interim residence.

The burden of proof on the department is heavy. It must prove current unfitness by clear and convincing evidence. "The requisite proof must be strong and positive; it must be 'full, clear and decisive.' " *Adoption of Iris,* 43 Mass. App. Ct. 95, 105 (1997) (citation omitted), *S.C.,* 427 Mass. 582 (1998).

> "[Biological] parents may not be deprived of the custody of their minor children in the absence of a showing that they 'have grievous shortcomings or handicaps that would

put the child's welfare in the family milieu much at hazard,' or 'unless some factor such as lengthy separation and a corresponding growth in the ties between the child and the prospective adoptive parents indicates that the child would be hurt by being returned to the natural parents.' "

*Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 590 (1981), quoting from *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 639, 646 (1975). Thus, while none of the judge's subsidiary findings was clearly erroneous, they do not prove parental unfitness by clear and convincing evidence. See *Custody of Eleanor*, 414 Mass at 799-802. Neither the judge's subsidiary findings, nor the record, indicates that the father "is so bad as to place the child[ren] at serious risk of peril from abuse, neglect, or other activity harmful to the child[ren]." *Care and Protection of Bruce*, 44 Mass. App. Ct. 758, 761 (1998).

In view of his envisaging the possible return of the children to the father, the judge apparently did not find the father's age or health determinative. Rather, he seemed to base his determination of unfitness on the father's lack of plans, primarily plans for interim housing. See conclusions 18-20, *supra* at 270-271.

In this connection, unlike the judge, we are not impressed with the department's efforts, at least with respect to the father. As the guardian ad litem, a former social worker for the department, reported, despite the department's involvement with the family in June, 1999, no one from the department attempted to contact the father until September 3, 1999, a few days before the care and protection petition was filed.[10] "The children were placed in an unrelated foster home and father's access to them was limited because of the plan to free them for adoption."

While in some cases uncontested evidence may fill in details

---

[10]The department's explanation is that the mother did not want it to contact the father. The mother's wishes in this case do not provide the department with an adequate reason for curbing the father's rights.

implicit in the subsidiary findings, an examination of the record as a whole does not support the judge's conclusion. Here, while the guardian ad litem's report reveals that the department was unhappy with the father's plans, especially for housing, the guardian ad litem pointed out that the father "has done what the [d]epartment has asked of him. . . . Although the plan and placement options do not meet [department] expectations, the social worker acknowledges that no feedback about this was given to father so that he could expand upon the information provided." Indeed, the guardian wrote, "Although father may currently be unable to provide for his children's housing needs, it is not clear to this GAL that he could not meet the children's other needs." She also commented: "Without efforts to give father the opportunity to try and either to fail or succeed, it is unclear to this GAL how any plan to keep these children separate from their family can continue."

The department's insistence that the father failed to come up with housing and other plans for his children is not convincing. Letters from his attorney indicate his efforts and the social worker acknowledged that he had complied in large part with the department's service plans. Moreover, he was not helped by the department other than by being given a list of places to call. The department acknowledged that it would not sanction a Federal Section 8 housing voucher[11] because the department's goal was adoption and not reunification.

Just as the Commonwealth may not deprive parents of the custody of their children because they are poor,[12] see *Custody of a Minor*, 389 Mass. 755, 766 (1983); *Care and Protection of Three Minors*, 392 Mass. 704, 713 n.12 (1984), the Commonwealth is not absolved from providing the services required under G. L. c. 119, § 1, because in its view, without any adjudication or supportable factual basis, adoption is the

[11]Title 42 U.S.C. § 1437f (1994 & Supp. 1999). See *Massachusetts Coalition for the Homeless* v. *Secretary of the Executive Office of Health & Human Servs.*, 422 Mass. 214, 219 & n.6 & 7 (1996). See also *Woods* v. *Executive Office of Communities & Dev.*, 411 Mass. 599, 602 (1992).

[12]The father indicated he would receive funds from the Department of Transitional Assistance if the children were returned to his care.

department's desired objective. Contrast *Adoption of Serge*, 52 Mass. App. Ct. 1, 9 (2001).

Surely, before a finding of unfitness is made, and even thereafter, particularly where as here the judge's findings indicate that with assistance and with planning the father may be able to parent his children, the department has the obligation under c. 119, § 1, to "encourage the use by [the father] of all available resources" to promote the "strengthening and encouragement of family life for the protection and care of [the] children." See G. L. c. 119, § 29C.[13] The department also must make reasonable accommodation to insure that its services are accessible to the father as a handicapped person. *Adoption of Gregory*, 434 Mass. 117, 122 (2001).

In view of these statutory mandates, and the circumstances of this case, the department should not have refused assistance to the father in obtaining housing on the ground that its plan is adoption. Moreover, where as here the judge rejected the department's petition for termination, the department should not have relied on the ultimate finding of unfitness to refuse to investigate the person with whom the father is living to see if such living arrangements are suitable for the children. At oral argument, the panel were informed that the department took the anomalous and incorrect position that because of the finding of unfitness it did not need to make that investigation, even though the judge had specifically refused to terminate the father's rights.

The judgment granting the department permanent custody is reversed, and the matter is remanded to the juvenile court to determine whether, consistent with this opinion, the children may safely be returned to the father (and if so, the reasonable time frame within which such return should occur), or whether some other arrangement can be worked out by the parties. We

[13]That section, as amended by St. 1999, c. 3, § 12, in relevant part provides: "Except as provided herein, if a court has previously committed, granted custody or transferred responsibility for a child to the department or its agent, the court shall determine not less than annually whether the department or its agent has made reasonable efforts to make it possible for the child to return safely to his parent or guardian. In making any determination, the health and safety of the child shall be of paramount concern."

have been informed that such proceedings or proceedings related thereto are now ongoing in that court. See note 3, *supra.*

*So ordered.*[14]

---

[14]In their appeal from the original judgment and from the denial of their motion for a new trial, the children argue that there was insufficient evidence to support the finding of the father's unfitness, that the children's trial counsel had a conflict of interest with the department's trial counsel because of her close "family-like" friendship with such counsel, and that the children were denied their right to effective assistance of counsel when trial counsel, despite the children's desire not to be adopted, filed jointly with the department in the trial court proposed findings and conclusions requesting that the court "terminate the parental rights of [the parents] and dispense with their consent to the adoptions of [the three children]." In view of our discussion of the father's appeal, we consider the claims of the children to be moot.