The mother appeals from a decree of the Juvenile Court that terminated her parental rights and failed to grant her posttermination or postadoption visitation. She argues that many of the judge's findings of fact are clearly erroneous, that these errors warrant reversal, and that the judge abused her discretion by failing to grant visitation. Although we will assume the mother is correct in some instances, we nonetheless affirm.
Facts. The record reveals the following, with additional facts reserved for discussion.[3] The Department of Children and Families (DCF or department) first became involved with the child in August, 2015, eight days after she was born, following the filing of a supported G. L. c. 119, § 51A, report (51A report) alleging neglect based on the mother's testing positive for marijuana during her pregnancy. Although there was no evidence that marijuana exposure had any adverse effects to the child, she was not a healthy baby, and was hospitalized for most of the first five months of her life as a result of two medical conditions. One condition was laryngomalacia, which caused her difficulty swallowing and breathing. She had surgery for this condition on September 14, 2015, but continued to experience difficulties. By December 5, 2015, the child still had a "significant airway issue" that required her to expend a large amount of energy on breathing, resulting in her "burning many more calories than she [was] taking in." As a result of this airway issue, she was diagnosed as a "failure to thrive" baby, and had surgery on December 23, 2015, to insert a feeding device known as a G-tube, off of which she was being weaned at the time of trial in March of 2017. The doctor who treated the child on December 5, 2015, had "no concerns" regarding the mother's care of the child and did not attribute the child's failure to thrive to any neglect on the mother's part.
Unlike her laryngomalacia diagnosis and related symptoms, the child's other medical condition raised concerns at the time regarding the mother's parental fitness. Shortly after birth, the child exhibited symptoms consistent with neonatal abstinence syndrome (NAS), a syndrome caused by opiate exposure during pregnancy. One of these symptoms was positive response to neonatal morphine. The child's symptoms were particularly concerning in light of the mother's history of opiate addiction and her use of opiates during a previous pregnancy. However, the mother denied using opiates during her pregnancy with the child, and the child's urine and meconium screens were negative. One neonatologist opined that, "absent any other medical information," he would explain the child's symptoms as being caused by the child's exposure to Effexor and Klonopin, medications that the mother was prescribed to treat her anxiety, depression, and obsessive-compulsive disorder. A few weeks later, though, a second neonatologist concluded that only NAS could explain the child's symptoms.
The record does not disclose how often the mother visited the child in the hospital during the first two months of the child's life, but both medical staff and DCF were concerned that she was not visiting enough. The mother attributed at least some of her absences to an illness and her distance from the hospital: the mother lived in Bridgewater, and the child spent time in both the South Shore Hospital in Weymouth and the Children's Hospital in Boston.[4]
The child was first discharged from the hospital in mid-October, 2015, into the care of the mother and the father listed on the child's birth certificate, who did not establish paternity and is not part of this appeal. Around this time, on October 22, 2015, the Probate and Family Court granted temporary custody of the mother's other two children to their biological father.
In the couple of months after the child was first discharged, the mother caused the child to miss several pediatric appointments, purportedly due to transportation issues. The child was readmitted to the hospital November 20-25, 2015, for her inability to gain weight. The mother missed some feeds during this hospital stay, although a doctor noted that the mother was "very appropriate in her handling of the baby and knowledgeable about the directed caloric intake for the baby and her medical condition." On December 2, 2015, a pediatrician instructed the mother to bring the child to the hospital if she did not reach a certain weight by December 4. The child did not meet that weight target, and the mother brought the child to the hospital.[5]
On December 7, 2015, while the child was in the hospital, the mother was evicted from her home. After her eviction, the mother was absent from the hospital. Social workers were concerned about the mother's absence because the child was not finishing her bottles and the mother was typically able to get her to finish them. At some point-the record does not disclose when-the mother and the putative father apparently moved in with the child's putative father's brother in Weymouth, but social workers were never able to enter the home because the brother locked the mother out when he was not there.[6]
On December 11, 2015, DCF took emergency custody of the child because it was concerned that the mother might sign the child out of the hospital against medical advice. While the child was in the hospital, the mother visited the child infrequently despite being offered daily visits. As a result, DCF reduce the mother's visitation to one hour every three weeks. The child remained in the hospital until January 13, 2016, when she was transferred to New England Pediatric Care in North Billerica. The mother attended no visits with the child in North Billerica. On March 31, 2016, the child was placed in medical foster care in Orange. The mother visited the child twice after this placement, the last visit being in May of 2016. Although she had previously attributed her failure to visit the child to financial difficulties, the mother did not accept DCF's offer of public transportation vouchers. She also refused DCF's offer to instruct her on how to use the G-tube, claiming, apparently incorrectly, that she knew how to use one. The mother did not attend trial.
Termination of parental rights. The mother first argues that the judge erred in terminating her parental rights to the child. To terminate a parent's rights, a judge must find that the parent is unfit and that termination of the parent's rights is in the child's best interests. See Adoption of Nancy, 443 Mass. 512, 515 (2005). The mother challenges only the judge's finding of unfitness. Parental unfitness "means more than ineptitude, handicap, character flaw, conviction of a crime, unusual lifestyle, or inability to do as good a job as the child's foster parent. Rather, the idea of parental unfitness means grievous shortcomings or handicaps that put the child's welfare much at hazard." Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997) (footnotes and quotation omitted). A judge must find unfitness by clear and convincing evidence, although he or she need only find subsidiary facts by a preponderance of the evidence. See Care & Protection of Laura, 414 Mass. 788, 793 (1993). A judge must base his or her determination of unfitness on an "even-handed, proper assessment of all the facts." Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption, 22 Mass. App. Ct. 62, 69 (1986). An appellate court will not disturb a judge's findings unless they are clearly erroneous. See Custody of Eleanor, 414 Mass. 795, 799 (1993).
A. Challenged findings. The mother challenges a number of the judge's findings of fact as either clearly erroneous or not even-handed assessments of the evidence. We analyze the challenged findings by category.
1. The mother's care for the child. The judge made a number of findings that painted the mother's ability to care for the child in a negative light. First, the judge found that "Mother has failed to monitor the child's weight," that "Mother lacks insight into [the child's] needs," and that "[w]hen she did visit, Mother did not assist with [the child's] care."
The finding that "Mother has failed to monitor the child's weight" is unsupported to the extent it means that she was unconcerned about the child's weight. The only evidence in the record regarding the mother's monitoring of the child's weight is a comment from Dr. Michael Piccioli, who examined the child when she was admitted to the hospital on December 4 or 5 for her weight problems. Dr. Piccioli said that the mother was "very appropriate and knowledgeable about [the child]'s feedings and caloric intake," and noted that she fed the baby "using a sideline feed which is often how parents are taught to feed baby's [sic ] with feeding issues." While the child did lose weight after being discharged to the mother's care, Dr. Piccioli attributed this to the child's medical condition alone. The evidence thus contradicts the judge's finding. Similarly, the judge's finding that the mother lacked insight into the child's needs is at least arguably misleading because it ignores Dr. Piccioli's observation that the mother was "very ... knowledgeable" about some of those needs. It does not rise to the level of clear error, though, because the mother's inattentiveness to the child, as demonstrated by her causing the child to miss three pediatric appointments and her occasional failure to feed and console the child when they were in the hospital, could have resulted from a lack of appreciation of the child's needs.
Next, there was evidence that the mother missed feedings during visits, so the judge was entitled to conclude that, during some visits, the mother did not assist with the child's care. However, the judge's finding that the mother "did not assist" with the care is also at least arguably misleading because it suggests that the mother never assisted with the child's care. And this the judge was not entitled to conclude. In addition to Dr. Piccioli's comment about the mother capably feeding the baby, one social worker was concerned that the mother was missing feeds in part because only the mother (and the child's putative father) was able to ensure that the child ate all her food. This presupposes that the mother did assist with the child's care on at least some occasions, and was an important part of it.
In addition to these findings, the judge made several references to the child's weight problems and her diagnosis of failure to thrive. The judge also compared the child's progress in the mother's care with her progress while in DCF's custody in the following way: "In the short period of time that [the child] was in Mother's home she did not fare well. She has made physical and developmental strides in the Department's temporary custody." The mother argues that these references and comparisons are not even-handed assessments of the evidence because they suggest, incorrectly, that the mother's alleged neglect was responsible for the child's weight problems.
As our recitation of the facts shows, there is no evidence that the mother was responsible for the child's weight problems, and we agree that the findings as presented may reasonably appear to mischaracterize the evidence. Although the judge elsewhere noted that "Dr. Piccioli raised no concerns regarding Mother," the judge's findings concerning the child's ill health might reasonably be interpreted as implicit imputations of responsibility, especially when combined with the finding that the mother did not monitor the child's weight. Furthermore, the judge's comparison of the child's health while in the mother's and DCF's care is at least arguably unfair because it does not mention the G-tube surgery, which took place after DCF obtained custody and presumably accounted for much of the child's physical improvement.[7]
2. The mother's substance use and mental health issues. The judge found that the mother's mental health treatment and treatment for substance use were "inconsistent," that she did not participate in mental health counseling, and that she stopped attending outpatient treatment for her opiate addiction. The judge also found that she rejected DCF's offer for a mental health referral, and concluded that "Mother fails to recognize and attend to her own needs." The mother challenges these findings as either clearly erroneous or not even-handed assessments of the evidence.
The evidence supports the judge's finding that the mother had stopped attending treatment for substance use, which itself supports the conclusion that her treatment for substance use was inconsistent.[8] The evidence also supports the judge's finding that the mother rejected DCF's offers for referrals and did not attend mental health counseling. However, there is nothing in the record to suggest that the mother was experiencing symptoms relating to her mental health issues that required treatment on top of the medication she was already taking. The judge's conclusion that the mother "fails to recognize and attend to her own needs" therefore can at least be argued to be misleading, at least insofar as it refers to her mental health issues. The same can perhaps be said about the finding that the mother's mental health treatment was "inconsistent": the record reveals no lapses in her mental health treatment apart from two isolated incidents in which she ran out of Klonopin, one of which was immediately before giving birth to the child, and the other of which she had already taken steps to rectify before the social worker discovered it.
The judge also found that the mother "used opiates during her pregnancy with [the child]," that the child "suffers from neonatal abstinence syndrome," and that the child's symptoms "squared with opiate withdrawal." The mother argues that the evidence in the record, including her statements and the child's negative screens, shows that the mother did not use opiates during her pregnancy with the child. However, the supported 51A report dated September 16, 2015, indicates that one of the neonatologists opined that negative screens were consistent with NAS, and diagnosed the child with NAS several weeks after a different neonatologist had opined that her symptoms were caused by exposure to Klonopin and Effexor. The judge reasonably could have credited the opinion of the second neonatologist because he had more information, including the child's continued positive response to morphine. The judge's findings concerning the mother's opiate use during pregnancy were not clearly erroneous.
The mother also challenges the finding that one of her older children suffered opiate withdrawal symptoms shortly after birth, arguing that the evidence shows that he was born addicted to Suboxone. Suboxone is an opiate, so the finding was adequately supported.
3. Housing. The mother challenges the judge's finding that the mother "claimed to be living" at the putative father's brother's house as misleading because it suggests that she might not have been living there. Regardless whether this finding implicitly suggests that the mother might not have been living where she said she was, that suggestion would be appropriate because DCF was never able to corroborate her living situation. The mother also challenges the judge's finding that she "did not invite [the social worker] into the home because [she was] locked out" as misleading because it suggests that the mother wilfully excluded the social worker from the home. The judge's finding does not suggest this and is proper.
The mother next challenges the judge's finding that, by December 11, 2015, she had not sought housing assistance. She argues that this is clearly erroneous because she had sought shelter with the putative father's brother. There is no evidence about when the mother moved in with the putative father's brother, and the social worker noted that, on December 23, the mother was "gather[ing] more paperwork that was needed by [the Department of Transitional Assistance]," which suggests that she had not obtained it by this point. This finding therefore was not clearly erroneous.
4. Interactions with DCF. The mother challenges the judge's finding that she is "an inaccurate reporter." While vague, we take this to mean that the mother has lied to or misled providers. This finding is supported by evidence in the record that the mother had lied to medical providers in connection with her previous pregnancy. She initially denied using Suboxone during that pregnancy, then later admitted to using it. The judge's adequately-supported finding that she used opiates during her pregnancy with the child also supports the finding that she is an inaccurate reporter.
The mother next challenges as misleading the finding that she "has a history with the Department." This finding is not misleading because she does have a history with DCF: DCF supported a 51A report concerning her drug use during a previous pregnancy.
The mother further challenges the judge's findings that she was late to a hospital appointment on December 4, 2015, which resulted in the filing of a 51A report. She argues that the judge erroneously found that she had no plans to take the child to the hospital and that the judge erroneously omitted the fact that the 51A report was unsupported. But the judge did not make such a finding, and did note the fact that the 51A report was unsupported. See note 4, supra.
The mother also challenges as misleading the judge's finding that she did not attend a foster care review on November 2, 2016, because, while she was not there in person, she was represented by counsel. This finding correctly states the evidence.
The mother next challenges the judge's finding that she did not contact DCF after October 7, 2016. This finding is clearly erroneous-a social worker testified at trial that the mother called her in February of 2017-but this error is inconsequential.
Finally, the mother argues that the judge erred in finding that she did not comply with any tasks on her service plan or "utilize the assistance offered by the Department." The service plan required her to perform ten tasks. First, the mother was required to meet with the social worker once per month, which she admits she did not do. Second, she was to sign all releases. Although the mother signed some releases before DCF created the service plan, she signed none afterwards. Third, she was to take all medication as prescribed and have all medication available during the home visits. There was no evidence that the mother failed to take her prescribed medication after the service plan was instituted, but the social worker was unable to conduct home visits to verify her medications. Fourth, she was required to update DCF of all medication changes within forty-eight hours. There is no evidence that her medication changed. Fifth, she was to engage in an evaluation for substance use. The mother told the social worker that she was on a waiting list for an evaluation but did not provide the social worker with the appropriate release; thus, the social worker was unable to verify that the mother was complying with this task. The judge reasonably could have drawn a negative inference from the failure to sign the release, particularly since the mother had a history of lying about her substance use. Sixth, the mother was to continue to meet with providers regarding her mental health diagnosis and engage in therapy. There is no evidence that she failed to continue to meet with existing providers, but neither is there evidence that she engaged in therapy. Seventh, the mother was to obtain stable housing adequate for an infant. This she did not do: even assuming she was living where she said she was, by her own admission she did not have reliable access to the house. Eighth, she was to give DCF a budget of how she would provide for the child's needs. There is no evidence as to whether she submitted the budget. Ninth, she was required to call before visits, arrive on time, and bring snacks. The mother missed many visits and was late for others. Tenth, and finally, the mother was required to attend all court dates and case reviews. She failed at this task. Indeed, she did not even attend trial.
While there was insufficient evidence in the record to support the judge's conclusion that the mother complied with no tasks on the service plan, the mother did not comply with some of the most significant ones, such as attending visitation and court dates and finding stable housing. We find no error in the judge's conclusion that the mother refused DCF's services. The mother did not accept DCF's referrals and, significantly, did not take advantage of DCF's transportation vouchers despite claiming that she was not attending visitation due to her indigence.
B. Analysis. A few of the judge's findings on trivial matters were clearly erroneous, but we will also assume there was clear error in the finding that the mother failed to monitor the child's weight. As discussed above, it might well be reasonable to read the judge to have mischaracterized some of the evidence concerning both the mother's ability to care for the child and her mental health status. For present purposes, we will also assume that the judge's decision contains the negative mischaracterizations we have identified.
These errors alone, however, are not enough to warrant reversal because "we need not disturb a judgment when error did not affect the outcome." Adoption of Sherry, 435 Mass. 331, 336 (2001). It is important to note here that the mother does not challenge, as either clearly erroneous or misleading, the most important fact underlying the judge's finding of unfitness: her total absence throughout most of the child's life, from May of 2016 to the time of trial in March of 2017. Although visiting the child would have entailed a substantial commute, DCF gave the mother opportunities to visit by offering her free transportation vouchers, which she did not accept. Indeed, she did not even attend trial, from which the judge was entitled to draw a negative inference. See Adoption of Talik, 92 Mass. App. Ct. 367, 371 (2017). The mother's actions manifested a profound indifference toward her relationship with the child.
The judge also appropriately considered the mother's lack of suitable housing. By her own admission, the mother could not enter her residence when the putative father's brother was not there. The judge was warranted in concluding that this was not a suitable arrangement for the child, particularly one with the child's health issues, and the mother stated in August of 2016 that she was not pursuing other housing options. Further, the judge was justified in concluding that the mother consumed opiates during her pregnancy with the child and that this indicated both a lack of concern for the child's well-being and ongoing difficulties with substance use. The mother could have addressed the latter inference with evidence that she underwent an evaluation for substance use, but she did not sign the appropriate release. Thus, even assuming the flaws we have described in the judge's findings, we are confident that they did not affect the outcome.
The mother also argues that we should reverse because DCF failed in its responsibility to provide her with services, which can be relevant to a judge's determination of unfitness. See Adoption of Ilona, 459 Mass. 53, 61 (2011). The mother claims that "all DCF did was mail Mother third-party information from DCF's Housing Specialist and direct her to seek housing assistance from the [Department of Transitional Assistance]." But this is not all DCF did: most notably, DCF actively attempted to facilitate visitation by offering the mother transportation assistance. Further, the mother does not explain how DCF could have done more in helping her to find appropriate housing when the evidence shows that she was not attempting to pursue it. The mother relies on Care & Protection of Elaine, 54 Mass. App. Ct. 266 (2002), but that case is very different from this one. In Elaine, we reversed an order granting DCF permanent custody that was based largely on a father's failure to find housing, where DCF admitted that the father was complying with most of the service plan but "refused assistance to the father in obtaining housing on the ground that its plan is adoption." Id. at 274. Here, the mother demonstrated very little initiative in complying with the service plan and DCF did not refuse her assistance. The finding of unfitness was therefore adequately supported.
Posttermination and postadoption visitation. The mother argues in the alternative, for the first time on appeal, that the judge should have ordered posttermination and postadoption visitation.[9] A judge has discretion to grant such visitation when it is in the child's best interests. See Adoption of Douglas, 473 Mass. 1024, 1027 (2016). The mother argues that the judge's lack of an explicit finding that visitation would not be in the child's best interests, in light of DCF's statement that it would "consider recruiting a pre-adoptive family that is receptive to an open adoption agreement," amounts to an implicit finding that visitation would be in the child's best interests. We disagree. The judge found that the mother and the child had no bond, which is one of the central factors in determining whether visitation is in the child's best interests.[10] See Adoption of Ilona, supra at 63-64. The mother did not request visitation. The absence of an order granting posttermination or postadoption visitation was not an abuse of discretion.
Decree affirmed.

Because the mother challenges a number of the judge's findings of fact, we draw from the record directly.

DCF gave the mother a transportation pass to visit the child shortly before the child's initial discharge. It is unclear whether she visited more often in the next few days after she received the pass.

A 51A report was filed because the mother was a few hours late in arriving at the hospital with the child. This report was unsupported.

The judge found that the home belonged to the putative father's brother, although the record suggests that it belonged to either the putative father's sister or both his brother and sister, not his brother alone. Because this fact is inconsequential and not challenged by the mother, we will refer to the home's ownership in accordance with the judge's finding.

The mother also challenges the judge's finding that the mother refused training for the G-tube because Dr. Piccioli noted her ability to care for the child. This finding was adequately supported. There was evidence that the G-tube requires special training that the mother did not have. The mother also challenges the judge's finding that this was the child's second G-tube surgery. The mother is correct, but this error is inconsequential.

The judge found that the mother "had been terminated from a clinic due to cancellation of appointments." The mother challenges this finding because there was evidence in the record that she left a "Clean Slate" program because it relocated, not due to cancellation issues. It is unclear whether the Clean Slate program is the same clinic to which the judge is referring. Regardless, there is also evidence that the mother admitted to being "terminated from her clinic due to her cancelling visit." The judge's finding is not clearly erroneous.

As of the time of trial, DCF's adoption plan was one of recruitment.

The mother challenges this finding as clearly erroneous, which it was not. The mother's total absence for most of the child's short life is evidence of the lack of a bond.