NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1221

ADOPTION OF ISLA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a Bristol Juvenile Court judge issued a decree that, among other things, terminated the father's parental rights with respect to his child pursuant to G. L. c. 119, § 26.  The father appeals, arguing that the judge committed clear error and abused his discretion in reaching his findings and conclusions.  We affirm.

Background.  We summarize the relevant facts from the judge's findings as follows.

1.  The father's incidents with the mother's two older children.  The mother has two older children, Keesha and Declan.[2] On February 12, 2018, a report was filed pursuant to G. L. c. 119, § 51A (§ 51A report), alleging physical abuse of the mother's four and one-half year old daughter Keesha by the mother's boyfriend.  Although the mother denied having a

---

[1] A pseudonym.
[2] The older children's names are pseudonyms.

boyfriend during the ensuing investigation pursuant to G. L. c. 119, § 51B (§ 51B investigation) and presented other reasons for the injuries to Keesha, Keesha's paternal grandmother and her partner expressed concerns, stating that the mother was in a relationship with an individual named "Freak."  At the conclusion of the investigation, the allegations of physical abuse were substantiated.

On August 14, 2019, another 51A report was filed, this one alleging physical abuse of the mother's three year old child, Declan.[3]  This report mentions two separate instances where Declan was brought to the hospital:  July 13, 2019, due to scalp lacerations, and August 13, 2019, due to an unexplained injury to his abdomen, which was filled with blood.

When asked by a detective about the injury Declan sustained on July 13, 2019, the mother stated that they had been in Providence at a park when Declan told her he had a cut and she took him to the hospital.  She told the detective she did not know how Declan had been harmed.  When asked about the injuries sustained in August, 2019, the mother stated that she had no idea what could have happened and no one had ever hit Declan.

---

[3] There was also a 51A report filed on August 13, 2019, alleging neglect of Keesha.  Nothing in the record before us indicates that this report relates to the father.

Declan's doctors believed his life-threatening, abdominal injuries were consistent with significant trauma.

The detective asked if the mother knew a male named "Freak," and the mother stated that she did not know anyone named "Freak," but believed social workers had asked her about an individual she had previously dated whom she had not seen for one and one-half to two years.  When asked for the name of the person she had dated, she gave the detective a first name, which the police later learned was the same first name as the father.  It was also later determined that the father was in the car with the mother when Declan was brought to the hospital in July, 2019.  Although the mother continued to deny that she was in a relationship with any individual known as "Freak," the judge did not credit the mother's denial, and the Department of Children and Families (department) identified "Freak" as the father.

As part of the department's investigation, a response worker and social worker talked to Keesha, who stated that she was living with her mother, Declan, and "Freak."  Keesha told them that the mother was pregnant and that "Freak" was the father.  Keesha stated that she was afraid of her mother and "Freak," did not feel safe, her mother and "Freak" take "white stuff" and "put the white powdered stuff in their mouths[,]" which made them "act like monster[s]," and that they cook the white stuff in the house.  She also reported that "Freak" made

3

her mother act different, "Freak" made her mother hit Declan hard on his buttocks, and that "Freak" hit her and Declan and had almost "cracked [Declan]'s head with a toy." She said that "Freak" hits her on the buttocks, the face, and the hand, and that her mother also hits her. The response worker noticed a large scar on Keesha's leg, which Keesha told her was from "Freak" burning her with a heater. At the end of this interview, the department assumed emergency custody of Keesha. While at the department's office shortly thereafter, Keesha saw a picture of the father and stated that he was "Freak."

The maternal stepgrandfather of Keesha and Declan also confirmed that the mother's boyfriend, whom he referred to as "Free," had burned Keesha's leg on a heater and had hit Declan on the head with a toy. He also said he believed Declan's injuries were caused by "Free." He also had seen the mother with black eyes and bruises before. At the conclusion of the 51B investigation, the allegations of physical abuse by the father and neglect by the mother were supported and incorporated into the open care and protection case that had been filed on behalf of Keesha and Declan.

On January 31, 2020, a new 51A report was filed after Declan told a department worker who was bringing Declan to visit his surgeon that "Freak" hurts him and punched him in the stomach a lot. During a forensic interview as part of a 51B

4

investigation, both Declan and Keesha disclosed extensive physical abuse by the father.

On February 21, 2020, and again, on February 26, 2020, the father was charged with assault and battery on a child with injury and reckless endangerment of a child. On November 17, 2020, these charges were nolle prossed, and on the same day, the father was indicted on charges of reckless endangerment of a child, assault and battery on a child with injury, and assault by means of a dangerous weapon. Following his arrest in February of 2020, the father was held at the Bristol County house of correction on these charges and was awaiting trial on them at the time of Isla's care and protection trial.

2. Isla's history. Isla was born on December 27, 2019. The day after Isla's birth, a 51A report was filed alleging neglect of her. The department filed a care and protection petition pursuant to G. L. c. 119, § 24, and received temporary custody of Isla after her emergency removal from the mother's care on December 30, 2019. The court approved the department's permanency plan for adoption at a hearing on February 15, 2022.

The father contacted the department only once around January 2020 from an anonymous telephone number. During this phone call, the father denied the allegations of abuse concerning the mother's other children and denied that he was the father of Isla. Shortly after Isla's birth, the father

5

became incarcerated, and since that time, he has continued to refuse to engage with the department and has expressed no interest in visiting with Isla or in establishing a relationship.

In or around November 2020, despite repeatedly denying knowing who the biological father of Isla was, the mother told a social worker at the department that the father was, in fact, the father of Isla. The social worker then mailed the father at least two service plans at the house of correction, which included the department's contact information, but never heard from the father at any point. The father filed a paternity action in January of 2021.[4]

Despite not hearing from the father, the department developed an action plan for the father after taking custody of Isla, and mailed it to him. The only initial task on the father's action plan was to meet with the department so they could conduct an assessment. This initial assessment never occurred because the father refused to meet with the department and refused to engage in an assessment or any services.

---

[4] Although we do not have a copy of any complaint alleging paternity, the father and the department have agreed that such a complaint was filed. Based on the transcript below, it appears that father wanted a paternity test to be performed. Nothing in the record indicates the father retracted his original denial of his paternity until after his paternity results were finalized.

About a week or two before the trial was scheduled to commence, the social worker learned that genetic testing had confirmed that the father was the other biological parent of Isla. Those results were sent directly to the father. The father's action plan was updated to include the requirements to engage in monthly meetings with the department, remain in communication with the department, sign necessary releases, refrain from illicit substance use, and engage in parenting classes. The updated action plan still included an initial assessment so the department might better identify areas of need. Again, the father did not respond to any requests by the department, and did not complete the initial assessment.

The social worker assigned to this case at no point visited the father, who was in custody at the house of correction from shortly after Isla's birth through trial. Although the house of correction did not allow in-person visits during the pandemic, this policy ended in May of 2022. The social worker did not attempt to visit the father when in-person visits were allowed again nor did she investigate whether they might speak over Zoom either before or after the COVID-19 policy ended. Nor did the social worker take the opportunity to meet with the father when he appeared in court for hearings in this case.

After exploring the paternal grandfather as a potential placement option to no avail, Isla was placed with a family

whose home overall met the physical and safety standards set forth by the department. The goal for Isla was then changed to permanency through adoption on May 28, 2020. At the time of trial, Isla was two and one-half years old, was seemingly doing well living with this family, and had never met the father.

3. Trial. The father was present at trial but did not testify. Given the criminal charges that were pending against the father involving alleged child abuse, the judge drew a negative inference from the father's failure to testify. The father has two other children, and at the time of trial, there was an open department case involving allegations of domestic violence against those children. The judge did not seem to rely on these allegations, and instead relied heavily on the criminal charges relating to the father's abuse of Declan and Keesha.[5]

The judge found that the department had used "appropriate efforts to contact Father and try to develop an action plan for Father." In making this finding, the judge noted that the department could have done more. The judge also found that

---

[5] While considering the factors under G. L. c. 210, § 3 (c), the judge incorrectly noted that factor xiii was applicable. See G. L. c. 210, § 3 (c) (xiii) (requiring consideration of parent's conviction of felony of such nature that child will be deprived of stable home for period of years.). We take this opportunity to note that this factor requires a conviction, which father did not have. The rest of the judge's discussion in relation to this factor, however, makes clear that the judge understood that father had not yet been convicted of abusing Declan or Keesha.

8

although the father's pretrial incarceration limited his ability to engage in any services with the department, it did not preclude him from cooperating with the department or attempting some level of involvement or contact with Isla. The judge found both the mother and the father unfit and that their unfitness was likely to continue for the indefinite future. The judge terminated their parental rights, approved the department's plan of adoption, and declined to order posttermination visitation between the father and Isla.

Discussion. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). The father makes three arguments on appeal: 1) the judge's determination that the department made reasonable efforts was clear error; 2) the judge failed to consider the father's efforts to establish his paternity when determining whether he was a permanently unfit parent; and 3) the father should have been given additional time after his paternity was established to work with the department prior to the termination of his paternal rights. We discuss each argument in turn, giving "substantial deference to the judge's findings of fact and decision, and . . . revers[ing]

9

only 'where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.'" Adoption of Luc, 484 Mass. 139, 144 (2020), quoting Adoption of Ilona, supra.

1.  Department's reasonable efforts.  "When a child is removed from his or her home and placed into the custody of the [department], the department is required by statute to make ongoing 'reasonable efforts to make it possible for the child to return safely to his [or her] parent or guardian.'"  Care & Protection of Rashida, 488 Mass. 217, 218 (2021), quoting G. L. c. 119, § 29C.  This general obligation also requires the department "to 'encourage the use by [the father] of all available resources' to promote the 'strengthening and encouragement of family life for the protection and care of [the] children.'"  Care & Protection of Elaine, 54 Mass. App. Ct. 266, 274 (2002), citing G. L. c. 119, § 29C.  "What constitutes reasonable efforts . . . must be evaluated in the context of each individual case, considering any exigent circumstances that might exist."  Care & Protection of Walt, 478 Mass. 212, 227 (2017).  "A judge's determination that the department made reasonable efforts will not be reversed unless clearly erroneous.  Adoption of West, 97 Mass. App. Ct. 238, 242 (2020), citing Adoption of Ilona, 459 Mass. at 61-62.  On this

10

record, we do not see any clear error in the judge's determinations.

Before terminating parental rights, the judge must consider the factors listed in G. L. c. 210, § 3 (c), see Adoption of Gregory, 434 Mass. 117, 126 (2001), several of which relate to whether the department provided reasonable services and whether the parent utilized said services.  See G. L. c. 210, § 3 (c). The father argues that although the judge considered these factors, the record does not support his conclusion that the department had made reasonable efforts.  Essentially, the father argues that the department's limited efforts to contact him while he was incarcerated fell short of the requirement to provide reasonable efforts.[6]  We disagree.

The judge acknowledged that the social worker did not meet with the father or inquire about Zoom visits and noted that she should have.  Despite those acknowledged shortcomings, however, the judge ultimately concluded that, while more could have been done, the social worker's attempts to contact the father by letter were sufficient given the father's lack of efforts to

---

[6] To the extent that the department contends that the father's arguments are waived because they were not properly raised below, see Adoption of Gregory, 434 Mass. at 129, we address the merits of the father's argument because the order denying his December 6, 2021, motion for a determination that the department failed to provide reasonable efforts was sufficient to preserve the issue on appeal.

"reach out to the Department, to pursue visitation, or engage in any services." In fact, in this case, the father initially reached out to the department denying paternity of Isla and did not provide an address or telephone number for the department to contact him. It was only when he was incarcerated that the department was able to contact the father, which they did via mail. Although the judge noted that the paternity testing took over two years, the judge also noted that the father, due to his detention, could not receive services. The judge concluded that in light of these circumstances, the department's efforts were reasonable. We agree.

Although the father cites the department's internal policies regarding the appropriate frequency of visits by social workers in most cases, the father has presented no facts or law that would make us question the judge's ultimate determination. We agree with the judge that more could have been done, but the law does not require that the department do everything it can, only that it make reasonable efforts in the context of the parent's individual circumstances. See Care & Protection of Walt, 478 Mass. at 227. Although the father disagrees, we conclude that his lack of effort to remain in contact with the department and seek services are among the many factors that the judge may consider when determining whether the department's efforts, in the context of the entire case, were reasonable.

12

See, e.g., Adoption of Yalena, 100 Mass. App. Ct. 542, 554 (2021) ("The department's obligation to make reasonable efforts to reunify the child with the mother is contingent upon her obligation to substantially fulfill her parental responsibilities [including seeking and using appropriate services]").

The father also asserts that the department had an obligation to arrange visitation with Isla. The social worker testified that the father was not offered any visitation because his paternity had not been established, and the father never requested any visits. The father is correct that, absent a finding that visits would be harmful to the child or the public interest, parents have a right to visit their child. See G. L. c. 119, § 35. However, the father cites no authority that suggests that the department is required to proactively offer visitation when, as here, the father denied being the biological father. The father even acknowledges that "the Department is not obligated to provide visits to a non-adjudicated parent." Finally, we note that nothing in the record indicates that, even in the short time period that paternity tests confirmed that he was Isla's father, the father ever asked to visit Isla or to have Isla visit him prior to trial.

The father similarly argues that, even if not legally obligated, it would have been appropriate for the department to

13

offer him visits with Isla. That, however, is not our standard, and the department's failure to proactively organize visitation between the father and Isla absent any determination that he was the father or any request by the father does not constitute an inherent failure to make reasonable efforts.

The father also argues that the judge's determination that he failed to engage in any services was error given that he was unable to do so due to his incarceration. Although the father is correct that the department was required to create an action plan for the father specifically tailored to his particular circumstances, it is unclear what more could have been done to tailor an action plan for him where he could not utilize any services. The action plan initially required the father to do one task: stay in contact with the department. He failed to do this.

In sum, the judge's analysis reveals a careful consideration of all of the relevant circumstances as to Isla's best interests and we see no error in this consideration. See Adoption of Ilona, 459 Mass. at 61-62. See also G. L. c. 119, § 29C. Accordingly, the judge's finding that the department's efforts were reasonable was not clearly erroneous in light of the father's inability to receive services due to his ongoing incarceration related to allegations of child abuse and given his lack of efforts to remain in contact with the department.

14

2.  Father's efforts.  The father next argues that the judge was inappropriately silent as to his efforts to obtain paternity testing and that the judge overemphasized the fact he was unable to undergo paternity testing until the eve of trial. While we agree that "[t]roublesome facts . . . are to be faced rather than ignored" (citation omitted), Adoption of Stuart, 39 Mass. App. Ct. 380, 382 (1995), we believe that the judge's findings accurately describe the father's efforts and the timeline of events concerning the paternity testing.  The judge noted that the father refused to "work to address the issue of establishing paternity while this case was initially pending," which is accurate.  Although the judge did not explicitly state the specific date on which the father began to seek paternity testing by filing a paternity action, the judge did acknowledge that the father attempted to establish paternity by observing that he "wanted to know paternity" before working with the department.  While the father's eventual efforts to establish paternity might minimally weigh in his favor, the judge's minimal discussion of those efforts in the larger context of his lack of efforts to be involved with Isla's life was appropriate.

Additionally, the judge's description that "[p]aternity was not established until April or May 2022, two years since the child entered care," and that the "[f]ather was adjudicated the biological father of [Isla] on the day of trial," was an

15

accurate description of the timeline of paternity testing. Nothing in the judge's findings leads us to believe that this finding weighed against the father. While the judge did note that the "[f]ather bears some responsibility to be involved," this seems to be a critique of his lack of effort to be involved with Isla, not that he was responsible for the delay in testing after it was sought several months prior to trial. Accordingly, we see no clear error of law or abuse of discretion in the judge's analysis of the timeline of the paternity testing.

3. _Additional time_. The father's final argument on appeal is that termination of his parental rights was premature, as he should have been given additional time to work with the department after his paternity was adjudicated and to establish a relationship with Isla. He cites no authority that would have required the judge to give him additional time to engage in services and only cites cases that state that a court may choose not to terminate parental rights even where the court finds the parent temporarily unfit. See, e.g., Adoption of Carlos, 413 Mass. 339, 350 (1992) ("it is appropriate for a judge to consider whether, on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary."). Even where the father's unavailability and his inability to engage in services due to his incarceration might have been temporary, the judge had ample

16

reason to conclude that his unfitness as a parent was not temporary.  Accordingly, we see no clear error in the judge's determination that the father's parental unfitness was not temporary.  We also find no support in the law for the proposition that a parent is entitled to additional time to engage in services after the judge has appropriately concluded that the parent's unfitness is not temporary.  We therefore see no abuse of discretion in the judge's decision not to provide the father with additional time to engage in services.

<u>Decree affirmed</u>.

By the Court (Green, C.J.,
  Walsh & Smyth, JJ.[7]),

Assistant Clerk

Entered:  March 25, 2024.

---

[7] The panelists are listed in order of seniority.