## ADOPTION OF LENORE.[1]

No. 01-P-16.

Worcester. June 7, 2001. - June 21, 2002.

Present: GREENBERG, COWIN, & McHUGH, JJ.

*Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Adoption,* Dispensing with parent's consent, Visitation rights. *Due Process of Law,* Adoption.

In a proceeding on a petition to dispense with parents' consent to adoption, the judge, in deciding whether the Department of Social Services made reasonable efforts to provide services to the mother as required by G. L. c. 119, § 51B(5), and 110 Code Mass. Regs. §§ 1.01 and 1.02 (1993), did not err in finding that no useful services existed. [277-279]

In a proceeding on a petition to dispense with parents' consent to adoption, there was clear and convincing evidence supporting the judge's conclusion that the parents were not currently fit at the time of trial. [279-283]

In a proceeding on a petition to dispense with parents' consent to a child's adoption, the judge properly left discretion as to postadoption visitation in the hands of the adoptive parents who would be in the best position to determine the extent to which, and circumstances under which, visits with the child's biological parents would be in the child's best interests in the future. [283-284]

PETITION filed in the Worcester Division of the Juvenile Court Department on May 24, 1996.

The case was heard by *Louis D. Coffin,* J.

*John T. Ouderkirk, Jr.,* for the mother.

*William A. Comeau* for the father.

*Ann Balmelli O'Connor* for Department of Social Services.

*Jennifer Tyne* for the child.

McHUGH, J. Petitions to dispense with consent to adoption often reveal difficult human dilemmas. This case surely is no exception. Our review of the record and of the trial judge's

---

[1] A pseudonym.

findings of fact and conclusions of law persuades us, however, that the ultimate finding of parental unfitness was supported by clear and convincing evidence and that none of the alleged errors about which the parents complain are sufficient to vitiate the judge's decision. Accordingly, we affirm.

Lenore, the subject of the petition, was born on March 8, 1996. At the time, her mother was just over twenty years of age and her father was slightly younger. The father was then in high school. The mother had received a high school "certificate of attendance" the previous spring and had married the father in August of 1995. Both parents were challenged by cognitive difficulties. The father's IQ was in the vicinity of fifty and the mother, after attending four years of high school, was unable to read.

Lenore came to the attention of the Department of Social Services (DSS) on May 6, 1996, via a report under G. L. c. 119, § 51A, from one of the father's teachers. In her report, the teacher, who was thoroughly familiar with the father and with the mother, said that the father had reported that the mother was slapping Lenore's hands whenever Lenore, then two months old, put them in her mouth.

In the report's wake, DSS commenced an investigation that ultimately supported the report. G. L. c. 119, § 51B. Thereafter, DSS filed an emergency petition for care and protection in the Worcester division of the Juvenile Court. The court granted the petition on May 24, 1996, and scheduled a seventy-two hour hearing for May 28, 1996. See generally *Care & Protection of Robert*, 408 Mass. 52 (1990). On that date, however, the mother and father, both represented by counsel, stipulated that there was probable cause to believe that Lenore was in need of care and protection. The judge then committed Lenore to the custody of DSS.

After a series of conferences and miscellaneous proceedings, trial was scheduled for May 20, 1997. On the day before the trial, however, the father, mother, and DSS tendered to the court a stipulation reciting that Lenore was in need of care and protection, that she was to remain in DSS's temporary custody, that the case would be continued for three months for disposition, and that, during those three months, DSS would investigate the

suitability of the mother's cousin, and the cousin's husband, as "a prospective placement." After a colloquy with the mother and father, the judge accepted the stipulation and entered an order adjudicating Lenore in need of care and protection. The disposition hearing occurred in November, 1997, at which time the court committed Lenore to the permanent custody of DSS.

In approximately February of 1998, DSS placed Lenore in a foster home with Mr. and Ms. Z who were unrelated to Lenore but quickly evinced an interest in adopting her. Consequently, in March of 1998, DSS amended its petition to seek dispensation from the need for the mother and father's consent to Lenore's adoption. Thereafter, the court held a trial for nine days stretched over six months. On July 6, 2000, the court filed a "Summary Notice of Findings and Order," in which it concluded that the mother and father were unfit and that Lenore's best interests would be served by terminating their parental rights. The court also approved a DSS plan that contemplated Lenore's adoption by her foster parents. The court ended its July 6 filing with a statement that "[i]n the event of an appeal, these summary findings will be expanded." The parents filed a timely appeal, and the court filed expanded findings on December 21, 2000.

The mother's appeal raises three principal issues: whether DSS made reasonable efforts to provide services to the mother as required by G. L. c. 119, § 51B(5), and 110 Code Mass. Regs. §§ 1.01 and 1.02 (1993); whether the ultimate findings of unfitness were supported by clear and convincing evidence and, in that regard, whether the record established a nexus between the mother's cognitive deficits and potential harm to Lenore; and whether the judge employed an impermissible standard in deciding not to order posttermination visitation. The father's appeal essentially tracks the mother's second and third issues. We treat each of the issues in order.[2]

Dealing first with the mother's claims regarding services,

---

[2]Two other issues can be resolved quickly. First, the mother contends that DSS failed to comply with rule 8 of the Rules of the Juvenile Court (1996), governing discovery in cases involving termination of parental rights, because it failed to turn over parts of its "social services file" and that the court erred by failing to order DSS to do so when the omission became apparent. It does appear that DSS withheld what it calls its "adoption record." When that with-

there is no doubt that DSS is required to make reasonable efforts to strengthen and encourage the integrity of the family before proceeding with an action designed to sever family ties. See *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 267-269 (1978); G. L. c. 119, §§ 1, 51B(5); G. L. c. 210, § 3(c)(v); 110 Code Mass. Regs. § 1.01. The requirement includes accommodating the special needs of biological parents who are handicapped or disabled. See *Adoption of Gregory*, 434 Mass. 117, 122 (2001); *Care & Protection of Elaine*, 54 Mass. App. Ct. 266, 274 (2002); 110 Code Mass. Regs. §§ 1:08, 1:09 (2000). Nevertheless, heroic or extraordinary measures, however desirable they may at least abstractly be, are not required. See *Adoption of Abigail*, 23 Mass. App. Ct. 191, 197 (1986); *Adoption of Mario*, 43 Mass. App. Ct. 767, 774 (1997). Moreover, at termination proceedings the focus is on the fitness of the parent to provide parental care and on the child's best interests. See *Adoption of Gregory, supra* at 121-122. Cf. *Care & Protection of Elaine, supra* at 269, 273-274.

In this case, DSS did suggest some services to the mother

---

holding was brought to the trial judge's attention, he held a hearing. At the end of the hearing, he told counsel for the mother that, if counsel believed that DSS had withheld something to which he was entitled, he could "draft proposed orders or present me legal authority that says that the kinds of materials that you apparently have not gotten . . . either are part of the DSS service file or that you're entitled to get them." While the trial proceeded over the next five months, counsel did neither. The issue thus has not been preserved for appellate review. See *Adoption of Mary*, 414 Mass. 705, 712 (1993). See also *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 697 (1984). Second, the mother argues that the trial judge impermissibly "amended" the July 6 findings after the mother took an appeal from the decree those findings produced. But in the July 6 findings, the trial judge stated that he was reserving the right to expand them in the event of an appeal. Later, when the mother moved to strike the expanded findings, the trial judge stated that he had issued summary findings to give the parties his thinking about the case more quickly than would have been possible had he initially taken the time to prepare his full findings and conclusions. Whatever the propriety of the procedure the trial judge followed, see G. L. c. 119, §§ 26, 27; G. L. c. 210, § 3, this is not a case in which reversal on grounds of procedural irregularity is appropriate. No party objected to the July 6 reservation of power to issue amplified findings. More important, the mother has not suggested in her brief any prejudice flowing from the second set of findings or even pointed to any material inconsistencies between that set of findings and the first.

and father in an effort to keep the family together. Unfortunately, some of the parents' subsequent applications for those services were rejected. The mother nevertheless persevered and participated in at least six parenting programs between 1996 and 1998. To be sure, perhaps guided by the opinion of Dr. Karson, the psychologist DSS had engaged to prepare an evaluation of the mother and father, that he knew of "no services that could reasonably be expected to make a difference in [the mother and father's] parenting skills in time to be of use to" Lenore, DSS efforts to find services for the father and mother were not extensive, notwithstanding the mother and father's manifestly great need.

In the end, though, even the expert the mother called to testify at trial, while criticizing Dr. Karson's report, never identified programs or services that would have helped the mother with her effort to parent Lenore successfully. Indeed, the primary criticism voiced by the mother's expert was not that Dr. Karson was wrong when he suggested the practical unavailability of useful services but that Dr. Karson's report did not spell out in sufficient detail the reasoning process that produced his conclusion. Under those circumstances, the trial judge was not clearly erroneous when he found that no useful services existed. In light of that finding, any deficiencies in the ardor with which DSS undertook its search for services do not affect the outcome.[3]

The second issue centers on both parents' claim that their current unfitness was not proved by clear and convincing evidence and, in that connection, that the evidence did not tie the mother's cognitive deficiencies to any unfitness at all. As will soon become evident, the evidence was more than adequate to support the finding of such a nexus. Also supported by more than sufficient evidence, however, were the following findings:

"45. Throughout the four years since [DSS removed Lenore from their care], both biological parents continue[d]

[3]This is not to suggest that the obligation of DSS to search for suitable services is wholly dependent on the view of a hired expert regarding what services are available. DSS itself has and must exercise the expertise necessary to match services with needs, and the trial judge must be vigilant to ensure that it does so. See *Adoption of Gregory, supra* at 124-125; *Care & Protection of Elaine, supra*; 110 Code Mass. Regs. §§ 1.08, 1.09.

to think about and care deeply for their daughter. They have faithfully attended supervised visits, and it hurts them now when [Lenore] calls her prospective adoptive parents Mommy and Daddy. . . .

"103. The biological parents are undoubtedly concerned about their child. They have faithfully attended supervised visits for the last four years. [Lenore] knows them [by their first names].

"104. Neither parent intentionally caused [Lenore] harm. Their unfitness is due to mental retardation (father), intellectual limitations (mother), their lack of independence and need for extensive support, and their likely inability to meet and overcome the uncertainties inherent to raising a child."

In other words, the mother and father did not deliberately place Lenore in harm's way either by their conscious acts or by a lifestyle they freely chose. On the contrary, they likely did as much to nurture Lenore as they were capable of doing. What they were capable of doing, however, fell well below the requisite level. Despite the difficulties inherent in concluding that basically good people, trying hard to parent Lenore, were fundamentally unequipped to succeed, the record simply permits no other conclusion.

When DSS first encountered Lenore, she was living with her mother, father, grandfather, and other family members in a house so roach-infested that the creatures crawled across the social worker's sandaled feet in broad daylight. The social worker found roaches crawling over food inside the refrigerator, in Lenore's room, on Lenore's pacifier and, on one occasion at least, on Lenore's head while Lenore sat in her father's lap. Although the mother and father acknowledged the problem the roaches presented, they had no concrete plan to drive the pests out. The front door to the house was broken and wide open, the living room smelled of garbage, and flies abounded. Although Lenore herself was clean, dressed appropriately, and in healthy condition, the social worker found a bottle containing green, curdled formula on a shelf in her room. The mother and father's teacher, Lenore's home health care worker, and Lenore's pediatrician all expressed to the social worker a belief that Le-

nore was at risk, not from intentional harm but from the consequences of the father and mother's inability to care for her adequately. To make matters worse, both parents were reluctant to accept outside help from DSS or from any other source of help that DSS recommended.

Lenore was removed from her parents' custody in May of 1996, and the trial occurred approximately three and one-half years later. The trial, of course, focused on the parent's then-current fitness, and the judge thus properly took into account the parents' character, temperament, conduct, mental stability, home environment, and capacity to provide for Lenore in a manner consistent with her needs, affections, and age. See *Adoption of Mary*, 414 Mass. 705, 711 (1993). Nevertheless, the circumstances under which DSS first encountered Lenore provide an important reminder that the court's judgments about current fitness and its predictions about future conduct were firmly rooted in the need to avoid resurrecting the past from which DSS had extricated Lenore.

There is little doubt that clear and convincing evidence supports the trial judge's conclusion that at the time of trial the parents were not currently fit. Whatever the father's precise level of mental acuity, even the cold transcript makes his limitations profoundly clear. He repeatedly manifested a near-complete lack of awareness of the world around him and an almost total lack of curiosity about the things he did not know.

At no time during their marriage had the parents been able to live independently. Neither had they been able to hold jobs and both were, and had been, supported by public assistance, chiefly in the form of Supplemental Security Income, or SSI, the benefits of which were available to them because of their disabilities.[4] The mother testified that one of her disabilities flowed from her artificial kneecap but that, although she knew she had another disability, no one had ever told her what it was.

---

[4]"Disabled" adults are eligible for SSI benefits. 20 C.F.R. § 416.202(a)(3) (2001). "The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a) (2001).

The mother's father was her "representative payee"[5] and, as such, received all of her benefit checks and paid all of her bills. At trial, the mother testified that she did not know why her father paid her bills or received her checks. She knew that her husband also received SSI benefits but she did not know why he received them and had never inquired. The father, too, had a representative payee.

When the trial began, the mother and father were living with a total of eight people, one of whom was the mother's sister, in a three-bedroom apartment. At some point while the trial was in progress, the mother's sister, to whom the mother had voluntarily surrendered legal custody of her younger son, left the apartment and the Commonwealth. The mother was unsure where the sister had gone, when she had left, or why. In any event, the sister's departure caused the mother and father to move back to her father's house, the very house where she had been living when DSS first encountered Lenore. The mother was unsure where she would live if Lenore were returned to her.

Lenore is a child with special language needs who made substantial progress with her needs while in foster care. During that period, the mother and father had not established a close relationship with Lenore, and the father, at least, appeared unaware of Lenore's own challenges. From all outward signs, Lenore did not particularly relish her visits with the mother and father and referred to them by their first names while calling her foster parents "Mom" and "Dad." As stated earlier, Dr. Karson, the DSS expert, believed that no set of services was available to assist the mother and father to become competent parents, and the expert the parents retained, although critical of Dr. Karson's methodology, proffered no suggestions about services that might help. Moreover, he agreed that an ability to care for oneself is an important quality for those who are entrusted with care of a young child and agreed that there were "concerns" about the mother and father's ability to care for themselves. Under all of

[5]The Social Security Administration appoints a "representative payee" when it determines that those eligible for benefits are unable to manage those benefits properly "due to a mental or physical condition or due to their youth." 20 C.F.R. § 416.601(b)(1) (2001). The representative payee then receives the benefits and spends them in the manner he or she determines "to be in the best interests of the beneficiary." 20 C.F.R. § 416.635(a) (2001).

those circumstances, the trial judge's conclusion that the biological parents were unfit at the time of trial was supported by evidence both clear and convincing.

Turning finally to the issue of postadoption visitation, the trial judge, after noting that "[p]ost-adoption visitation was not a live issue at trial," concluded that "visitation [was] best left in the hands and discretion of [Lenore's] adoptive parents." As a basis for that conclusion, the judge found that both of Lenore's biological parents had faithfully attended supervised visits when Lenore was in foster care, that neither had intentionally harmed her, and that though "[t]he parents tr[ied] to engage with [Lenore], . . . there [was] not much interaction between them. [Lenore] separate[d] easily at the end of the visits, and [was] happy to see" her foster mother. Continuing, the judge found that "[a]s [Lenore] matures, undoubtedly she will become more involved in her own and new family activities. Her [biological] parents' limitations will become more apparent, perhaps to the point of unease or embarrassment."

Clearly, the court has the power to order postadoption visitation. See *Adoption of Vito*, 431 Mass. 550, 556-562 (2000). The question whether to do so turns solely on an analysis of what is in the child's best interests. *Id.* at 562. That determination is to be made by weighing all of the factors bearing on the issue. *Ibid.* A decision not to order postadoption visitation will be reversed only for abuse of discretion. *Adoption of Nicole*, 40 Mass. App. Ct. 259, 264 (1996).

The trial judge's speculation that, as Lenore grew older, she might become uneasy or embarrassed at her parents' limitations was unwarranted either by the evidence or by general principles. It is just as easy to suppose that as Lenore comes to recognize the challenges her parents faced, she would, either on her own or with the compassionate assistance of her adopting family, admire the efforts her parents made to deal with those challenges, particularly the initiative her biological mother displayed in searching out and completing courses designed to help her become a better parent.

That said, Lenore, now just over six years old, has been in foster care for all but the first ten weeks of her life. The evidence is unchallenged that she has "formed strong, maturing bonds

with [her] preadoptive family, and there is little or no evidence of a significant, existing bond with [either] biological parent." *Adoption of Vito, supra* at 563. Accordingly, the trial judge properly left discretion as to postadoption visitation in the hands of the adoptive parents who will be in the best position to determine the extent to which, and circumstances under which, visits with Lenore's biological parents will be in her best interests as the years progress. See *Adoption of Gwendolyn*, 29 Mass. App. Ct. 130, 139 (1990).

*Decree affirmed.*