NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1268

ADOPTION OF ISAR.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial in the Juvenile Court, the judge issued a decree finding that the father was unfit to assume parental responsibilities for his son, Isar, terminated his parental rights, ordered posttermination and postadoption visitation, and approved the adoption plan proposed by the Department of Children and Families (department).[2]  The father appeals, claiming that the department failed to make reasonable efforts to accommodate his disability by (1) denying his request for an accommodation to increase visitation time and (2) failing to hold a meeting pursuant to the Americans with Disabilities Act (ADA).  We affirm.

---

[1] A pseudonym.

[2] At a separate trial, the mother was found to be unfit, and her parental rights were terminated.  She did not appeal.

Background.  One day after his birth in August 2021, the department received a report from a mandated reporter pursuant to G. L. c. 119, § 51A, alleging neglect of Isar due to the parents' lack of clarity about where they would be living after discharge from the hospital.  The department conducted an emergency visit, during which it learned that the parents were living in a rooming house that was "not suitable" for a child.  The parents reported that they would be moving in with the child's paternal great-aunt and grandfather in Rhode Island, however neither parent could provide an address or phone number.  On investigation, the department learned that the family home in Rhode Island was a "short-term option only."

The following day, the department conferred with the parents about having Isar remain an additional night in the hospital so the department could continue its investigation and assess the parents' living situation.  After resistance from the father, the department initiated an emergency removal of Isar and filed a care and protection petition pursuant to G. L. c. 119, § 24.  The father subsequently waived his rights to a temporary custody hearing, and the department was granted temporary custody.  When he was less than ten days old, Isar was placed in the care of a foster family, with whom he remained at the time of trial.

2

After Isar's removal, the department provided the father with an action plan to facilitate reunification.  It became clear to the department in the nascent stages of the case that the father has "cognitive difficulties and issues with processing information," and in response the department tailored the action plan to meet his needs.  The department provided the father with a clinical parent aide who specialized in assisting parents with intellectual or mental health challenges, submitted a referral for a neuropsychological evaluation to assess his learning patterns and intellectual functioning, and paired him with a social worker experienced in working with adults with cognitive limitations.  The action plan also tasked the father with obtaining stable and appropriate housing, attending weekly supervised visitations with Isar, and enrolling in an intimate partner abuse education program assessment.[3]

Between August 2021 and December 2022, the department endeavored to assist the father in making progress with his action plan.  In October 2021, the department referred the father to a housing consultant and provided him with ample resources for housing assistance services.  However, throughout

_____

[3] The father was charged with assault and battery on a pregnant person and domestic assault and battery with Isar's mother as the victim in two separate cases.  Those charges were ultimately dismissed.  In addition, in 2018 the father was charged with domestic assault and battery against the mother of his other child.  That case was also dismissed.

3

the case, the father maintained an unstable living situation, moving between his family's home in Rhode Island, the rooming house in Brockton, staying in hotels or with friends, and at times staying in New York.  The department also facilitated the father's enrollment in a domestic violence assessment program, offered virtually and at no cost to the father while he searched for employment.  After repeatedly missing sessions, the father was terminated from the program in April 2022.  In November 2021, the department referred the father to a clinical parent aide to help develop his parenting skills; however in April 2022 he was similarly terminated from the service for lack of engagement, with the provider noting that there was "no effort on [the father's] end."  The department followed up by referring the father to a different parent aide, but he never completed the intake process.

In December 2021, the father's social worker sat down with him and helped fill out the intake paperwork for the neuropsychological evaluation and scheduled his appointment for January 2022.  Despite a reminder from the social worker, the father missed the appointment, and after assistance rebooking a second appointment, missed the rescheduled appointment in June 2022 as well.  Through December 2022, the department continued to offer the father support in rebooking a third appointment,

4

including offers to pay for transportation, but the father stated that he was not interested.

In March 2022, the father's attorney hired an independent expert to assess his parenting progress. After observing several visits between the father and Isar, the expert recommended that the father be given additional parenting time to continue to develop his parenting skills. However, the father had recently discussed with the department his difficulty making the current visitation schedule due to his commute between Rhode Island and Massachusetts and his work schedule. The father was nevertheless offered additional parenting time, which he declined. In the months following the independent expert's request, the father missed at least six scheduled visits.

The father stipulated to being unfit in May 2022, and due to the lack of progress with his action plan, the department changed the goal from reunification to adoption in June 2022. Isar, now three years old, has lived with his foster mother since he was less than two weeks old.

Discussion. The father appeals the termination of his parental rights and argues that the department failed to make reasonable efforts to accommodate his disability by (1) denying his accommodation request for increased visitation time and (2)

5

failing to hold an ADA meeting.  See G. L. c. 119, § 29C.  We are not persuaded.

1.  Reasonable efforts.  "It is well-established that a parent must raise a claim of inadequate services in a timely manner."  Adoption of Daisy, 77 Mass. App. Ct. 768, 781 (2010), S.C., 460 Mass. 72 (2011).  "If a parent believes that the department is not reasonably accommodating a disability, the parent should claim a violation of his rights under either the ADA or other antidiscrimination legislation, either when the parenting plan is adopted, when he receives those services, or shortly thereafter."  Adoption of Gregory, 434 Mass. 117, 124 (2001).  Other avenues include requesting an administrative fair hearing, rejecting the action plan and filing a grievance, filing an abuse of discretion motion, or raising the issue during a pretrial conference.  See Adoption of West, 97 Mass. App. Ct. 238, 242-243 (2020).  "A parent cannot raise a claim of inadequate services for the first time on appeal, as the department would not have had the opportunity to address it." Id. at 242.  Here, the father did not raise the claim in the Juvenile Court, or at any point in the proceedings when the department or the judge could properly evaluate it. Consequently, the claim is untimely and therefore waived.  See Adoption of Yalena, 100 Mass. App. Ct. 542, 554 (2021).

Even assuming, arguendo, that the claim was preserved, the father's argument is belied by the record. "Where a parent, as here, has cognitive or other limitations that affect the receipt of services, the department's duty to make reasonable efforts to preserve the natural family includes a requirement that the department provide services that accommodate the special needs of a parent." Adoption of Ilona, 459 Mass. 53, 61 (2011). "The department must 'match services with needs, and the trial judge must be vigilant to ensure that it does so.'" Id., quoting Adoption of Lenore, 55 Mass. App. Ct. 275, 279 n.3 (2002). "Nevertheless, heroic or extraordinary measures, however desirable they may at least abstractly be, are not required." Adoption of Lenore, 55 Mass. App. Ct. at 278. "A judge's determination that the department made reasonable efforts will not be reversed unless clearly erroneous." Adoption of West, 97 Mass. App. Ct. at 242, citing Adoption of Ilona, supra at 61-62.

Here, the judge's findings that the department made "exhaustive efforts" to provide the father with appropriate services, and the plethora of resources and assistance offered to him, find ample support in the record. The department tailored its interactions with the father to accommodate his needs by breaking down and simplifying instructions; communicating information in person, in writing, over text message, and by voicemail; making multiple referrals to

7

specialized programming and providing hands-on assistance filling out intake paperwork; sending appointment reminders and advocating for replacement services when the father missed appointments; and arranging services at no cost to the father.

Despite the department's efforts, the father did not meaningfully engage in the services provided. He missed both appointments for a neuropsychological evaluation (and later refused to comply with an evaluation geared to better assess his needs), he was terminated from the parent aide service for noncompliance, he failed to follow through with the replacement aide, and he was terminated from the free and virtual domestic violence education program due to repeated absences. Moreover, the father rebuffed the department's efforts by asserting that he neither needed nor wanted the services provided. As the judge noted when evaluating reasonable efforts, "[t]his is not a case where a parent with significant limitations seeks out, or is receptive to, assistance." Because the father "denied [his] mental health needs by refusing both evaluation and treatment, [he] cannot successfully argue that [the department's] reasonable efforts failed to accommodate properly [his] mental health needs." Adoption of Eduardo, 57 Mass. App. Ct. 278, 282 (2003).

Regarding the request for increased parenting time, the judge found, and the record reflects, that additional visitation

8

time was offered to and refused by the father, and no further pretrial action was taken by the father or his attorney to address this specific request. Indeed, the department was responsive to the father's scheduling needs throughout the case by modifying the visitation schedule to accommodate his work and lengthy commute when he brought such concerns to the department's attention.

As to the ADA meeting,[4] while the father asserts that an ADA meeting was the best method to explore his needs, such a meeting was only one of several tools available to the parties to address his needs, and we discern no clear error in the judge's findings that the department made reasonable efforts to otherwise accommodate his cognitive limitations. See Adoption of West, 97 Mass. App. Ct. at 242.

2. Termination of parental rights. "To terminate parental rights to a child, the judge must find, by clear and convincing evidence, that the parent is unfit and that the child's 'best interests will be served by terminating the legal relation

---

[4] The department, per its Disability Policy # 2022-01(I)(A), as in effect at the time of this case, defined an ADA meeting as "[a] meeting held between Department staff and a parent (and their counsel if applicable) when necessary to discuss a parent's disability-related needs and requests for a reasonable accommodation, or to review a disability-related complaint and discuss potential resolution." The department's definition of an ADA meeting was revised in 2023. See Disability Policy # 23-04(II)(A). The revisions would not affect our analysis here.

between parent and child.'" Adoption of Luc, 484 Mass. 139, 144 (2020), quoting Adoption of Ilona, 459 Mass. at 59. "When reviewing a decision to terminate parental rights, we must determine whether the trial judge abused [her] discretion or committed a clear error of law." Adoption of Elena, 446 Mass. 24, 30 (2006). "[T]he judge's assessment of the weight of the evidence and the credibility of the witness is entitled to deference." Custody of Eleanor, 414 Mass. 795, 799 (1993).

While the father contends that the judge prematurely terminated his parental rights prior to a thorough exploration of his disability-related needs and support network, the judge made extensive findings of fact, supported by the record, related to the father's cognitive limitations, their effect on his parenting abilities, and the department's response to those needs. Contrast Adoption of Chad, 94 Mass. App. Ct. 828, 829, 839-840 (2019) (further explication needed regarding mother's mental disabilities before termination of parental rights warranted). Moreover, the father's disability was not the sole basis for the judge's determination. The judge also looked to the father's inability to improve over time; his failure to provide Isar with a stable home; his lack of compliance with the action plan and ability to benefit from the services offered; his history of domestic violence; his mental health; and his overall inability to meet Isar's needs. These findings were

10

grounded in the evidence, and all support the judge's determination that the father was unfit to parent Isar and that his unfitness was likely to continue indefinitely.[5]

Decree affirmed.

By the Court (Blake, Walsh & Hodgens, JJ.[6]),

Clerk

Entered:  October 1, 2024.

---

[5] We note that the judge's finding that the father was unemployed at the time of trial was clearly erroneous, as it appears that he was employed in demolition.  However, this does not impact our analysis.

[6] The panelists are listed in order of seniority.