NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-27

ADOPTION OF TALIB.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from a decree issued by a Juvenile Court judge finding him unfit and terminating his parental rights to his son, Talib.  We conclude that the trial judge erred in finding that the Department of Children and Families (DCF) made reasonable efforts at reunification, in light of its failure to communicate with the incarcerated father and to schedule parent-child visits once requested.  Nonetheless, the trial judge properly terminated the father's parental rights as the evidence demonstrated that he was unfit and likely to remain so indefinitely.  Accordingly, we affirm.

---

[1] A pseudonym.  The mother's parental rights were terminated in 2023; she is not a party to this appeal.  The father of the child's older sister, initially believed to be the father of the child, did not appeal the termination of his parental rights to the child's sister and is not a party to this appeal.

1.  Background.  The child was born in October 2019.
Although no father was listed on the child's birth certificate,
the mother initially believed the child's father to be the same
man as the father of the child's older sister.  DCF first became
involved with the child in May 2020 when the mother was arrested
after bringing the child and his older sister to her fight with
another adult and subsequently driving away from the fight at a
high rate of speed with both children in the vehicle.  Prior to
the completion of DCF's investigation of this incident, the
mother was again arrested after she drove under the influence
and crashed into nine parked vehicles while the child was in the
vehicle.  DCF assumed emergency custody of both the child and
his older sister following this incident.

In February 2021, the mother informed DCF that she believed
the father was the parent of the child.[2]  The father was
incarcerated at that time, as he had been for a portion of the
mother's pregnancy and the birth of the child.  The father has
an extensive criminal background involving multiple assault and
firearm related convictions.  The father remained incarcerated
for a firearm offense during the entirety of the trial.

---

[2] At trial, the mother testified that the father of the
child's older sister took an at home paternity test four months
after the child's birth, which revealed the man was not the
child's father.

2

In May 2021, the father was added to DCF's family action plan and included on all subsequent DCF reports and plans. As part of this plan, the father was required to "(1) make his whereabouts known to [DCF] and provide contact information, (2) make monthly contact with [DCF], (3) adhere to rules set forth by the CJS and refrain from engaging in further criminal activity, and (4) establish paternity of [the child]."

In the father's initial conversation with a DCF social worker in August 2021, he admitted that he was aware of the child and the possibility that he was the child's father but he wanted a paternity test to confirm. The father further noted that the mother had informed him the child was his. DCF subsequently engaged a different agency to schedule paternity testing for the father and child. Apparently because of the COVID-19 pandemic and scheduling issues, the father was unable to establish his paternity until September 29, 2022.

Prior to this determination, in April 2022, the father expressed his desire to assume custody of the child when the father was released from prison. The father stated he planned to get a job upon release and that he was presently on the wait list for college courses and a welding class and was already enrolled in criminal addictive thinking and parenting classes. The father reiterated his desire to assume custody upon his

3

release at a July meeting with a social worker, adding that he "would like to do anything to speed up the process." DCF informed the father that parent-child visits could be scheduled once paternity was confirmed.

No parent-child visits were scheduled prior to the termination of the father's parental rights. Following the confirmation of the father's paternity in September 2022, the father was reluctant to have the child brought to the prison, informing DCF that he would contact them when he wanted the child to visit. The father chose to not contact DCF and schedule visitation even after the start of the termination trial on October 27, 2022. Instead, the father made only one visitation request, on February 16, 2023, and did not otherwise contact his social worker between December 2022 and March 2023.

In response to the visitation request, DCF conducted an assessment into whether and how to provide visits. DCF failed to complete this assessment prior to the end of the trial in March 2023, resulting in the father's never meeting or communicating with the child.

In April 2023, the judge found the father unfit and terminated his parental rights to the child. This appeal followed.

4

2. Standard of review. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Because termination of a parent's rights is an 'extreme step,'. . . a judge must decide both whether the parent is currently unfit and whether, 'on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary.'" Adoption of Ilona, 459 Mass. 53, 59 (2011), quoting Adoption of Carlos, 413 Mass. 339, 350 (1992). "In making this determination, a judge must consider 'a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age.'" Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018), quoting Adoption of Mary, 414 Mass. 705, 711 (1993). General Laws c. 210, § 3 (c), provides a nonexhaustive list of factors to be weighed in determining the fitness of a parent.

Where there is clear and convincing evidence that the parent is unfit and likely to remain so, we give substantial

5

deference to the trial judge's decision regarding the child's best interests and "reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. at 59. "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Adoption of Larry, 434 Mass. 456, 462 (2001), quoting Custody of Eleanor, 414 Mass. 795, 799 (1993). An abuse of discretion exists where the decision "amounts to a 'clear error of judgment' that falls 'outside the range of reasonable alternatives.'" Adoption of Talik, 92 Mass. App. Ct. 367, 375 (2017), quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

3. Reasonable efforts. "Before seeking to terminate parental rights, [DCF] must make 'reasonable efforts' aimed at restoring the child to the care of the natural parents." Adoption of Ilona, 459 Mass. at 60, quoting Adoption of Lenore, 55 Mass. App. Ct. 275, 278 (2002). When an involved parent is incarcerated, DCF's regulations expressly require DCF employees "to work in cooperation with incarcerated parents to promote a healthy relationship with their children, and to avoid permanent

6

separation."  110 Code Mass. Regs. § 1.10 (2008).  These required "efforts shall include regular visitation at the correctional facility, as well as the holding of case conferences and other consultations at the correctional facility."  Id.  "[R]egardless of whether parents are incarcerated, [DCF]'s regulations prohibit it from terminating visitation 'unless the matter is brought before a judge, and the judge makes specific findings demonstrating that parental visits will harm the child or the public welfare.'"  Adoption of Franklin, 99 Mass. App. Ct. 787, 795 (2021), quoting 110 Code Mass. Regs. § 7.128 (2008).

Here, DCF violated its own regulatory obligations through its failure to schedule requested visitation.  DCF argues that its failure to schedule visitation was the result of the father's singular, delayed request and logistical difficulties related to the father's incarceration and the transportation of the child from New Hampshire.  That explanation, however, is not supported by the evidence at trial.  At trial, a DCF social worker testified that, when the father requested a visit, DCF had to make "[a] clinical decision."  She explained that DCF "would like to acknowledge . . . what's in the best interest of [the child], taking him where he has never met [the father], taking him into the jail, the impact that would have on the

child."  She testified that her superiors at DCF had to approve visitation, and that she had "brought it to the attention of my supervisor and emailed my supervisor, our attorney, and it then should go up to the area program manager."  The social worker further testified that the clinical team would "make the decision of the best interest of [the child] of whether or not he should be able to see his father."

We acknowledge that, two weeks later, counsel for DCF at trial represented to the trial judge that DCF had by then "been in contact with the jail or attempted to have contact with the jail in regards to visitation and how that would work, and whether Facetime or other means of communication would be possible" and was "still waiting to hear back from the . . . jail."  He also described the "logistical issue that DCF is trying to resolve in terms of how transportation would work."  Putting aside that the representations of counsel were not evidence, see Danny D. v. Eli E., 102 Mass. App. Ct. 901, 902 (2023), waiting one month without offering a visit, and merely leaving messages for the prison, was wholly inadequate to comply with the regulatory requirement of "regular visitation at the correctional facility."  110 Code Mass. Regs. § 1.10.

Moreover, this particular regulatory violation is emblematic of how DCF's general relationship with the father

fell short of the "special efforts" required by DCF's regulations for dealings with incarcerated parents. 110 Code Mass. Regs. § 1.10. Although DCF tasked itself with maintaining monthly contact with the father, social workers participated in just five planned conversations with the father between May 2021 and March 2023. At trial, a DCF social worker failed to explain her inability to engage even once with the father between December 2022 and March 2023 despite being in the same court house as the father on separate occasions. The social worker further testified that she never attempted to meet the father at the prison as "the previous social workers hadn't," rendering the father "a phone contact" and person to speak with at hearings. In sum, the record did not support the judge's finding that DCF made reasonable efforts at reunification.

4. <u>Termination of parental rights</u>. "[A] determination that reasonable efforts were not made does not preclude removal or confirmation of the department's temporary custody, or even the ultimate termination of parental rights." <u>Care & Protection of Rashida</u>, 489 Mass. 128, 133 (2022), citing G. L. c. 119, § 29C. Furthermore, DCF's duty to make reasonable efforts presumes the father's fulfillment of his own responsibilities, including action plan compliance and maintaining meaningful contact with DCF. See <u>Adoption of Eduardo</u>, 57 Mass. App. Ct.

9

278, 282 (2003) ("Because the mother failed to make use of the services offered to strengthen and then reunify her family and denied her mental health needs by refusing both evaluation and treatment, she cannot successfully argue that [DCF's] reasonable efforts failed to accommodate properly her mental health needs or to strengthen her family").  Ultimately, "our lodestar is necessarily the best interests of the child."  Adoption of Bea, 97 Mass. App. Ct. 416, 417 (2020).  This determination is within a judge's discretion.  See Adoption of Nancy, 443 Mass. 512, 516 (2005).

To her credit, the trial judge did not ignore DCF's shortcomings when issuing the decree.  Indeed, the trial judge noted that she was "troubled" by the lack of contact with the father, finding DCF "arguably could have done more to work with [the father] on a monthly basis and to offer parent-child visitation once [the father's] parental rights were established."  As she correctly noted, despite her misgivings, the judge "must act in [the child's] best interests."

Here, termination of the father's parental rights was in the best interests of the child as the record established that father had no meaningful likelihood of success as a parent to the child.  It was the father's ongoing criminal activity that precluded him from being present for the mother's pregnancy, the

10

birth of the child, and the entirety of the child's short life. When first confronted by DCF about the possibility that he was the child's father, the father was reluctant to assume parental responsibility, despite admitting he was already aware of the child and the possibility that he was the father. When the father did choose to become involved with the child, he failed to offer a viable plan for how he would provide for the child upon his release, vaguely claiming he would get a job despite previously being unemployed and financially reliant on the paternal grandmother. The father's inability to plan for the child's future was compounded by his failure to take advantage of offered services while incarcerated. Despite claiming to be enrolled in multiple classes, including a parenting class, and on the wait list of several others, the father offered evidence of his completion of only one course.

Moreover, the father never met or communicated with the child and made no effort to do either until well into trial. Accordingly, the father did not develop a bond with the child or understand the child's needs. Although the father points to, and we acknowledge, DCF's failure to schedule visitation, the father himself contributed to this failure as he made only one request for visitation and did not otherwise communicate with

11

DCF as to feasibility of other forms of interaction with the child.

Finally, the judge reasonably concluded that termination was in the best interests of the child as it freed him for adoption by the same family as his older sister. The siblings already lived together with this family at the time of trial, having been placed there in August 2022. In that time, the siblings bonded with the family. The adoption social worker explained how both children "go to [the adoptive mother] for . . . comfort." Moreover, trial testimony confirmed the siblings' own close bond, with the older sister described as "like the mother of [the child]," and the child as "always want[ing] to do what [his sister] is doing."

DCF's decision to prioritize placing the child together with his older sister in the home of the sister's paternal aunt over other alternatives is supported by the trial evidence. When the father's paternity was established, attempts were made to determine if any paternal family members could assume custody of the child. The child's paternal grandmother was considered but found ineligible because of limited residential space. The paternal grandmother was informed that she would be reconsidered if she found a larger residence, but communication with her lapsed and she did not attend the trial. The paternal

12

grandmother had no relationship with the child and had never met him.  Accordingly, based on trial evidence, the trial judge acted within her discretion in determining that being freed for adoption and placed with the same family as his sister was in the child's best interests.  See Adoption of Jacques, 82 Mass. App. Ct. at 610.

Decree affirmed.

By the Court (Shin, Ditkoff & Brennan, JJ.[3]),

*Paul Little*

Clerk

Entered:  November 8, 2024.

---

[3] The panelists are listed in order of seniority.

13