NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-632

ADOPTION OF JAZZY (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial, a Juvenile Court judge found the mother and the father unfit, terminated their parental rights, concluded that adoption by the children's maternal aunt and uncle would be in their best interests, and declined to order post-decree contact.  On appeal, the parents argue that the judge abused his discretion by failing to (1) determine whether the Department of Children and Families (DCF or department) made reasonable efforts to unify the family, (2) adequately consider whether guardianship rather than adoption by kin was in the best interests of the children, and (3) order future contact between the parents and the children.  We affirm.

Background.  "We summarize the relevant facts and procedural history as set forth in the judge's decision and as

_____

[1] Adoption of Yuri.  The children's names are pseudonyms.

supported by the record, reserving other facts for later discussion." Care & Protection of Vick, 89 Mass. App. Ct. 704, 705 (2016).

1. DCF involvement. The family's history with DCF began in 2011 when it investigated reports of child neglect pursuant to G. L. c. 119, § 51A (51A reports). During the investigation, the mother did not stop Yuri, a toddler at the time, from walking out onto the roof alone. Many reports of physical violence between the parents followed. In December 2019, a 51A report was filed alleging neglect of Yuri and his younger sister Jazzy following a report from the son that the parents had a physical altercation the night before. The son reported that the parents were hitting each other and then the son began to hit the mother, which led the daughter to hit the son. After investigating and learning the children had excessive absences and tardiness from school, the department opened a case for services.

In February 2020, the father brought the son to a police station, reporting that the mother slapped the son after he tried to get between the parents to stop the mother from assaulting the father. Between January 8, 2020, and February 14, 2020, the children arrived late to school every day, which

prevented the son from engaging with support classes, as part of his individualized education plan (IEP), for nearly two weeks.

In March 2020, the police responded to reports of screaming and yelling inside the family home.  The father reported that the mother attacked him and broke a mirror.  The father had a mark on his back and a bump on his head.  The mother was arrested and charged with assault and battery on a family or household member and possession of prescription medication that did not belong to her.  The father met with a response worker the following day and voiced his concern for the mother, stating that the prescription pills were not hers and that he wanted to have her "committed."  The department worker informed the father that if the judge ordered the mother to stay away from the home, the father was not to allow the mother back in the home.  Later that day, the social worker called the mother's cell phone and could hear the children talking to the mother.[2]  As a result, the department became concerned that the mother was back in the home after her release from jail, raising further concern because of the mother's ongoing domestic violence and substance use.

_____

[2] The judge did not credit the father's testimony that DCF did not work with him to keep the mother out of the home.  The judge also did not credit the mother's testimony that she was never told by DCF that she was not allowed into the home.

A final 51A report was filed on May 6, 2020, alleging that the reporter had not seen either child for several weeks, and that when the reporter visited the family home to conduct a wellness check, the mother was sitting outside the apartment, though the reporter believed the father had obtained a restraining order against the mother. During the check, the children were sleeping at 9:30 A.M. and not engaged in their schoolwork. Later on May 6, 2020, DCF response workers arrived with police at the family home. The mother answered the front door, yelling that the home was hers and that she took care of her children. The mother also said that the father tried to lock her out of the home but that she had a key. The children were removed from the home. During the transport to a foster placement, the children stated that they were scared of their mother and reported that the mother is always in the home, that she breaks in, and that she assaults the father.

2. Care and protection proceedings. DCF filed a care and protection petition the following day, and the children were placed with their maternal grandparents from May 2020 through December 2021. Since December 2021, the children have lived with their maternal aunt and uncle in a neighboring State. When the children were placed with the maternal aunt and uncle, they did not know to brush their teeth regularly or how to bathe or

4

wash their hair.  Additionally, they did not appear to have a bedtime routine and getting them to bed was difficult.  Since being placed with the aunt and the uncle, Yuri no longer requires an IEP and is employed at a restaurant.

Throughout the care and protection proceedings, three separate foster care reviews found that neither parent participated in their action plans in each review period, and that they barely engaged in any recommended services.  The only services the parents completed were two parenting courses, from which the trial judge concluded they gained little to no parenting skills.  The trial judge further found that both parents still refused to take accountability for how their actions led to their children's removal and continued to lack insight into how their lack of engagement contributed to continued DCF care.

Along with not meaningfully engaging in services, the mother and the father failed to maintain contact with their children or the department throughout the pendency of the case. Neither parent had an in-person visit with the children since January 2022.  That visit took place at Chuck E. Cheese and ended with a police response due to the escalated and verbally assaultive behavior of the mother and the father.  When the maternal aunt was called back to pick up the children from this

visit, she reported that they were distraught, crying, and hyperventilating.

The parents were initially permitted to call the children. However, because the parents would call at inappropriate times, such as during school hours or late at night, the plan was changed so that the parents had to contact the maternal aunt and uncle before speaking with the children. After several calls pursuant to this plan, the maternal aunt saw the children hang up crying and upset. The parents were subsequently "blocked" on the children's cell phones and social media accounts. In September 2022, the father had a virtual visit with the children; it went well, but the children were quiet and minimally engaged. In May 2023, the department scheduled the mother and the father for a family visit, but they arrived at the wrong office location and on the wrong date.

Both children testified in camera at the trial to answer questions agreed on by the parties. The son was fifteen years old, and the daughter was thirteen. Both children testified that they loved their parents, but that they wanted to live with their aunt and uncle.

The trial judge concluded that neither parent "made any effort to engage with the [d]epartment, participate meaningfully in their service plan, or maintain contact with their children

for the past five years." Based on his findings, he ruled that (1) the parents were unfit to assume parental responsibility for the children and would likely remain unfit for the indefinite future, (2) the best interests of the children would be served by terminating parental rights, (3) adoption by the children's maternal aunt and uncle would be in their best interests, and (4) any future contact would best be left to the informed decision-making of the adoptive parents.

Discussion. 1. Reasonable efforts. The mother and the father argue that the judge failed to make a reasonable efforts determination in his ultimate findings and that such failure calls into question the trial judge's findings of permanent unfitness.

"Before seeking to terminate parental rights, the department must make 'reasonable efforts' aimed at restoring the child to the care" of the parents (citation omitted). Adoption of Ilona, 459 Mass. 53, 60 (2011). "The court shall make the certification and determinations required under this section in written form, which shall include the basis for the certification and determinations." G. L. c. 119, § 29C. "A judge's determination that the department made reasonable efforts will not be reversed unless clearly erroneous." Adoption of West, 97 Mass. App. Ct. 238, 242 (2020). Despite

this requirement, "even where the department has failed to meet this obligation, a trial judge must still rule in the child's best interest." Id., quoting Adoption of Ilona, supra at 61.

The parents touched on reasonable efforts during cross-examination and in their closings. Assuming without deciding that this was sufficient to timely raise the issue,[3] we are not persuaded there was reversible error. Here, the parents are correct that the trial judge did not make a written finding of fact or conclusion of law stating that DCF made reasonable efforts to reunify the parents and the children. Nonetheless, the record, and the trial judge's findings in the aggregate, demonstrate that DCF did make such reasonable efforts. First, the trial judge stated on the record at one of the final days of trial that he "found reasonable efforts for each of the children" and approved the adoption plan proposed by DCF.[4]

---

[3] The department cites Adoption of Yalena, 100 Mass. App. Ct. 542 (2021), as support for the proposition that an argument that the department failed to make reasonable efforts must be raised before trial. For the purposes of this appeal, we do not need to resolve this question. We note that "[r]aising the issue at an early stage in the proceedings allows the department to remedy the [allegedly] inadequate services, which in turn fosters a greater chance of family reunification." Adoption of West, 97 Mass. App. Ct. at 242.

[4] To the extent the parents argue that the trial judge erred by not considering whether DCF made reasonable efforts specifically to reunify the family at trial, their argument is misplaced. Once the trial judge approved DCF's proposed permanency plan in July 2021, reunification of the family was no

8

Second, the trial judge found that DCF recommended services to the parents to ameliorate their parental shortcomings, but that the parents did not "meaningfully engage" in any of those services, except for two parenting classes from which the parents gained "little to no parenting skills."[5]  Moreover, while the trial judge recognized in his findings "the challenges to communication where parents are homeless and have no address," he emphasized that the parents made no attempt to remain in contact with DCF or the children and that they "want[ed] nothing to do with DCF."[6]  Put differently, where the parents refused to communicate with DCF and meaningfully engage in the services it recommended, it cannot be said that DCF did not make reasonable efforts.  See Adoption of Lenore, 55 Mass. App. Ct. 275, 278

---

longer consistent with the permanency plan.  See Care & Protection of Rashida, 488 Mass. 217, 220 n.6 (2021), S.C., 489 Mass. 128 (2022), quoting G. L. c. 119, § 29C ("'[i]f a court has determined . . . that reasonable efforts to safely return the child to his [or her] parent or guardian are inconsistent with the permanency plan for the child,' the department must make 'reasonable efforts to place the child in a timely manner in accordance with the permanency plan'").

[5] Contrary to the parents' contention, the trial judge did acknowledge that the mother engaged in services to ameliorate her substance use, but found that she was not consistent in engaging in those services and denied her drug use throughout much of DCF's involvement with the family.

[6] We note that where a parent is unhoused or the department knows the address it has for a parent is out of date, the better practice is to send an e-mail message and text a cellular telephone number if provided by the parent.

(2002) (for DCF to satisfy its duty to make reasonable efforts, "heroic or extraordinary measures . . . are not required").  The record and the judge's oral finding of reasonable efforts, plus the evidence of domestic violence and substance use over a period of years coupled with the parents' failure to take responsibility or learn despite action plans and some limited engagement with services, demonstrate that DCF did make such reasonable efforts.  We discern no error.[7]

2.  <u>Consideration of guardianship</u>.  The parents also assert that a guardianship plan was proposed to the trial judge and that he abused his discretion by failing to consider it.  We disagree the parents had proposed guardianship rather than adoption.

After an initial determination of parental unfitness, the trial judge must then determine whether it is in the best interests of the children to permanently terminate the parent-child relationship.  See <u>Adoption of Ramona</u>, 61 Mass. App. Ct. 260, 265 (2004).  When the rights of both parents are terminated, the judge is required to assess all placements for the child, including the DCF plan and the plans presented by any

_____

[7] We also note that, "[d]espite the moral overtones of the statutory term 'unfit,' the judge's decision was not a moral judgment or a determination that the mother and father do not love the [children]."  <u>Adoption of Bianca</u>, 91 Mass. App. Ct. 428, 432 n.8 (2017).

10

other party.  Adoption of Dora, 52 Mass. App. Ct. 472, 474-475 (2001).  See G. L. c. 119, § 26; G. L. c. 210, § 3 (c).  "In choosing among placement plans, it falls to the sound discretion of the trial judge to determine what is in the best interests of the child, and our review on appeal is one of 'substantial deference.'"  Adoption of Bianca, 91 Mass. App. Ct. 428, 434 (2017), quoting Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999).

Here, the parents never proposed a competing permanency plan for the trial judge to consider.  The parents argue that the father's counsel specifically raised guardianship with kin as an alternative plan during trial, but the record says otherwise.  At trial, guardianship was only mentioned when counsel for the father (1) asked the maternal aunt if she had ever "looked at other forms of permanency such as guardianship" or filed a petition for guardianship, and (2) suggested to the trial judge that one of the judge's in camera questions to the children should inquire about "adoption versus guardianship." This limited mention of guardianship was inadequate to constitute a competing plan.[8]  See Adoption of Dora, 52 Mass.

---

[8] Additionally, when DCF proposed a permanency plan of guardianship in June 2021, the father filed an objection to it.

11

App. Ct. at 475 ("In cases where the parents have offered a competing plan, the judge must assess the alternatives and, if both pass muster, choose which plan is in the child's best interests, however difficult that choice may be" [emphasis added]). It was in the trial judge's discretion to conclude that the adoption plan proposed by DCF was in the best interests of the children.[9]

3. Post decree contact. The parents argue that the trial judge abused his discretion by not ordering posttermination or postadoption contact between the parents and the children. We are not persuaded.

"After finding parental unfitness, a judge 'has broad discretion to determine what is in a child's best interests with respect to custody and visitation with biological family members thereafter.'" Adoption of Breck, 105 Mass. App. Ct. 652, 664 (2025), quoting Adoption of Ursa, 103 Mass. App. Ct. 558, 571 (2023). "An order for postadoption visitation is not warranted in the absence of a finding that a significant bond exists

_____

[9] To the extent the parents argue that the trial judge thought he was unable to order a plan of guardianship, we disagree. The record reflects that the trial judge correctly understood that he was conducting a trial to determine whether the children were in need of care and protection and whether the parents' parental rights should be terminated. The trial was not to decide whether the children were to be adopted. See G. L. c. 119, § 26 (b) (describing additional orders trial judge can make upon finding child in need of care and protection).

12

between the child and a biological parent and that continued contact is currently in the best interests of the child" (quotation and citation omitted). Adoption of West, 97 Mass. App. Ct. at 247.

Here, the trial judge expressly concluded that there are no significant bonds between the parents and the children, and that "any post-termination contact is best left to the informed decision making of the adoptive parents."[10] He noted that neither parent had visited the children since the father's virtual visit in September 2022 due to the parents having little to no contact with DCF and failing to confirm visits. The trial judge also emphasized that the parents' last in-person visit

---

[10] This order implicitly included postadoption visitation, given the findings of no bonds. See Adoption of West, 97 Mass. App. Ct. at 247. Contrary to the parents' contention, the maternal aunt did not unreasonably obstruct the parents' communications with the children; the trial judge credited the maternal aunt's testimony that the parents were blocked from the children's cell phones and social media accounts only after the parents called the children at inappropriate times, and that the children repeatedly became upset and cried after calls with the parents.

13

with the children resulted in the police being called and the children crying and hyperventilating.  We discern no error.

Decrees affirmed.

By the Court (Henry, Hand &
  Allen, JJ.[11]),

Clerk

Entered:  March 2, 2026.

---

[11] The panelists are listed in order of seniority.